**NATIONAL LABOR RELATIONS BOARD v. ARMA CORPORATION (INDEPENDENT INSTRUMENT MAKERS & MACHINISTS COUNCIL, Intervenor).**

No. 275.

Circuit Court of Appeals, Second Circuit.

July 23, 1941.

CLARK, Circuit Judge, dissenting in part.

of counsel), for respondent, Arma Corporation.

Sweet & Sweet, of New York City, (Irving Sweet and Samuel Sweet, both of New York City, of counsel), for Independent Instrument Makers and Machinists Council.

Before SWAN, AUGUSTUS N. HAND and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The respondent Arma is a New York corporation engaged in the manufacture and sale of precision instruments and related products at a plant in Brooklyn. Most of its products are sold to the United States Navy. The Board found that it had dominated and interfered with the formation and administration of Independent, which has intervened as a party to this proceeding, and had contributed support to it in violation of Section 8 (2) of the National Labor Relations Act, 29 U.S.C.A. § 158(2); had discriminated in the hire and employment of four of its employees in violation of Section 8(3) of the Act, and by these things and through the use of labor spies and through other manifestations of hostility toward self-organization, had interfered with, restrained and coerced the employees in violation of Section 8(1). In addition to requiring Arma to cease and desist from the foregoing unfair labor practices and from giving effect to its contract with Independent, the Board required Arma to disestablish Independent as bargaining representative of its employees; to offer reinstatement and back pay to the employees discriminated against, to instruct not only its supervisory employees but its so-called "key-men or straw bosses" not to discuss labor affiliations with the employees and to post appropriate notices. A fuller outline of the terms of the order appears in a statement heretofore set forth.

### Labor Spies.

During the year 1935 Arma became a member of National Metal Trades Association and, while such, arranged to have agents of the Association work in its plant. At the time this arrangement was made, the general superintendent of Arma was told that an agent of the Association was already employed at the Arma factory and was on its payroll, but that it was expedient for the superintendent not to know his name. Arma argues that the agents were

Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Frederick N. Davenport, Jr., Mary Lemon Schleifer, and William J. Isaacson, all of Washington, D. C., Attys., National Labor Relations Board, for petitioner.

White & Case, of New York City (Joseph A. Bennett, Alfred N. Heuston and William J. Killoran, all of New York City,

not spies and that membership in the Association was only to make use of the latter's department for training apprentices, to detect stealing by the employees of Arma, from which it was having some trouble, and to get advice in developing social security and unemployment insurance data and forms. But to obtain these services Arma paid upwards of $2600, while the only stolen tools that were found had a value of but $50. Arma, about January 1936, "finding the game not worth the candle", gave up its membership. While a member of the Association reports were furnished by the latter, if they still existed at the time of the hearing they were not produced. Instead of producing them, Arma rested its proof upon oral statements by witnesses that the reports had made no reference to union activities of the men.

In the LaFollette investigation, the National Metal Trades Association seems to have been charged with furnishing labor spies and it was referred to as an agency engaged in such an activity in Labor Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368. But while, under the circumstances, membership in the Association may lead to some suspicion that a purpose of Arma's membership in the Association was to maintain surveillance of the union activities of the employees, the only real evidence was to the contrary. We accordingly can see no justification for the conclusion of the Board that the purpose of the membership was an unlawful surveillance of attempts to organize. This is particularly true in view of the fact that there were no labor troubles in the plant during the period of membership. The relation with the Association, which ceased more than a year before other alleged acts of interference and domination arose, can hardly have had any connection with the organization or maintenance of the union formed by the employees. Even if given the worst interpretation, it would show no more than a prejudice of Arma against labor unions. If any tenuous proof that Arma employed spies in 1935 exists, we think the employment, long since ended, had no bearing on the real issues.

### Alleged interference, restraint and coercion.

In May, 1937, five of Arma's employees began discussing the question of union organization and on May 22 three called on Allen S. Haywood, C.I.O. Regional Direc-tor in New York City, to request the help of C.I.O. in organizing the plant. On May 24, Haywood introduced Benjamin Lifshitz, whom he had assigned to organize the Arma employees and also those of the nearby plant of the Ford Instrument Company. On May 27, a mass meeting, sponsored by C.I.O., was held, at which Raue was elected temporary chairman, Murray temporary secretary, and McCarthy temporary treasurer. On June 7, Raue, Murray and Mc-Carthy had a conference with Robert L. Nelson, Arma's general superintendent. On June 3, C.I.O. held another meeting of the employees. Because of an unfounded belief on the part of the C.I.O. members that some of them had been transferred to the night shift to chasten them for their C.I.O. activities, the C.I.O., on June 8, distributed a hand-bill stating that "the management of * * * Arma * * * is intimidating some of the employees because of their union activities in the plant." It was charged that literature attacking C.I.O. as a Communistic organization was distributed by the employer and was found both outside and inside the plant. That inside was found: (1) by McCarthy in a washroom used by the milling machine department, (2) by Neugran on his workbench, (3) by Fidellow on an inspection bench and in the washroom, and (4) by Sadowski in a pigeonhole of a work-bench in the stockroom. These, or at least some of them, seem to have been reprints of anti-C.I.O. articles in the Chicago Tribune. The Board found that the pamphlets were placed in the plant by Arma, or with its knowledge and consent. Much was made of the fact that the pamphlets distributed outside the plant bore the stamp of "American Society against Communism Incorporated", while those inside did not. As a matter of fact, the only pamphlet in evidence was found inside the plant and bore the above stamp. But whether pamphlets were stamped or not seems wholly irrelevant. At the time there was bitter opposition to the C.I.O. among many of the men and no evidence was adduced to connect the company or its supervising employees with the distribution of this literature. C.I.O. literature, as well as literature attacking the C.I.O., was found in the plant. This was established by testimony of various witnesses and was almost inevitable in view of the controversy that was going on.

The Board found that solicitation in support of Independent went on at the plant during working hours and was not prevent-

ed by the corporation, but there was abundant evidence that foremen stopped solicitation on company time of membership in either union, whenever the matter came to their attention, and that the corporation showed its neutrality and was diligent in preventing supervisory employees from interfering with movements for labor organization. A marked instance of this occurred when Neilson, the assistant superintendent, came into the office of Nelson, the general superintendent, with Wise who was organizing Independent, and with Sears, Farley and other zealots for that union. Nelson said to them: "We can neither help nor hinder you in forming an organization * * *. There is nothing I can do any more than tell you that." He had already addressed a meeting of the employees in a similar vein. The upshot of it all is that two rival unions were struggling for control, doing considerable canvassing within the plant and, in spite of injunctions by representatives of the company not to do these things during working hours, they went on by both factions, and Independent won out. The corporation advanced no money to aid the latter, or the employees interested in forming it, and no meetings were held at the plant.

The principal ground suggested for the finding that Independent was company-dominated is the action of "key men or straw bosses" which is said to have amounted to coercion and to have been binding on Arma within the doctrine of International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. Labor Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309, and Labor Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L. Ed. 368. One of the foremen named Wallicki suggested to Raue, who was the originator of the C.I.O. movement in Arma that Raue should join the A. F. of L., of which Wallicki was a member. This suggestion was in the course of a conversation begun by Raue outside the plant and seems to have been the only instance of even a possible act of interference by any one of as high rank as a foreman. It naturally had no effect on Raue or anyone else. The key men were not supervisory employees in any proper sense, but were only an amorphous group of employees senior to small groups of from one to four apprentices or workmen junior in service to the key men, who were supposed to furnish leadership and advice to the juniors in a limited field.

The key men, like the other workmen, were paid by the hour and received no additional compensation by reason of services rendered as key men as distinguished from their ordinary tasks, with the possible exception of a negligible bonus at Christmas. If such employees were not to be free to express their opinions and to urge fellow-workmen to organize in a certain way, the interest and activity of the most competent men in the appropriate bargaining group would be eliminated. The key men had no power to hire or fire apprentices assigned to them, or to recommend any of them for promotion. There was no evidence that the officers or supervisory employees consented that key men should represent the views of the corporation, or gave the other workmen reason to suppose that the key men worked for Independent in order to please Arma. If the latter had interfered with the labor activities of the key men, except to prevent canvassing during working hours, it surely would have been guilty of an unfair labor practice and would have deprived these men of rights guaranteed under Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157.

Another basis for holding that Arma discriminated against C.I.O. in favor of Independent is the haste with which the latter was recognized as the representative of the employees. It is admited that C.I.O. never secured a majority. The charge seems to be that it would have done so if more time had been given it. Reliable employees informed Arma that Independent had obtained a majority, and that was the fact. After this majority was verified by a count, Arma entered into the contract with Independent. Why there should have been further delay, unless to give C.I.O. a chance to upset the decision, is not apparent. If a union organized and maintained by employees is ever to be allowed, it should have been permitted here.

### Lay-off of Raue, Noonan, Nelson and Fidellow.

The Examiner concluded that there was not sufficient evidence that any of these men, except Fidellow, was discharged for union affiliation and activities, but the Board reversed the Examiner and held that all were discharged for supporting C.I.O. We think there clearly was no ground for reversing the Examiner in the case of Noonan and Nelson.

Noonan was laid off on June 2 and recalled about two months later. Business had slackened so much that 218 men were laid off in May, 45 in June, and 19 in July. Many of these were members of C.I.O. It seems entirely arbitrary to attribute the discharge of Noonan, followed as it was by an early reemployment, to discrimination against his labor affiliations. The decision in the case of Nelson was equally unfounded. He was an unimportant employee of no moment to Arma in its relations with C.I.O. He joined Independent the day he was laid off and there is no foundation for attributing his discharge to membership in or advocacy of C.I.O.

█ In respect to the discharge of Fidellow and Raue the order must be sustained. There was a conflict in the evidence as to whether Fidellow neglected his duties to the company in order to write plays and short stories during working hours; also as to whether his work was good or more or less incompetent. He was discharged on June 11 and the company has refused to take him back. The Examiner and Board both found that the discharge was because he joined and assisted C.I.O. It cannot be said there was no substantial evidence justifying such an inference and the Board must accordingly be sustained in its finding. In respect to Raue, who seems to have been both the initiator and the chief sponsor of the C.I.O. movement in Arma, there was likewise substantial evidence to justify the inference that he was discharged and not reemployed because he had been active in the C.I.O. movement. He testified that Wallicki, the machine supervisor under Neilson, said to him on one occasion: "You know, after all, there is something like loyalty. You know a company likes people that are loyal to it * * *. I think you are making a very foolish move. You know you were pretty well liked here before, but now you have gotten your foot into it; you are now in hot water". While these remarks originated in a conversation initiated by Raue and obviously had no effect on his action, and while the Examiner reported that there did not appear to be "sufficient evidence to justify a finding that Raue was discharged for union affiliation or activity", the Board reached the contrary conclusion upon what must be regarded as substantial evidence. But Raue was not discharged until July 16, 1937. This was after the contract with Independent was in effect and it had obtained the right to represent the employees, a right which continued, as far as appears, up to the time of the Board's order. His discharge would seem to have had no bearing on the disestablishment issue.

█ For the foregoing reasons the provisions of the order directing the withdrawal of recognition of Independent as the representative of the Arma employees and disestablishing it as such representative were not warranted. It may be true that the discharge of Fidellow, if supposed by his fellow employees to have been due to his C.I.O. membership, might have had some slight effect in discouraging further C.I.O. activities. But disestablishment would seem an unduly drastic remedy for this discharge even though coupled with the remarks of Wallicki and, after the struggle was over, the layoff of Raue. Other C.I.O. members of far greater importance in the labor movement than Fidellow, such as McCarthy and Neugren, and, for the time being, Raue, still remained employees. Disestablishment would hardly have been ordered by the Board if it had not found, as it did, that acts of key men assisting Independent to organize were unfair labor practices for which the employer was responsible.

For the above reasons, enforcement of 1 (a) of the order is granted, and of 1 (b), (c), (d), (e), (f) and (g) and 2 (a) and (b) is denied.

Enforcement of 2(c), as modified by the elimination of the words "to Rheinhold Nelson", is granted.

Enforcement of 2(d), as modified by the elimination of the remedial provisions in favor of Richard B. Noonan and Rheinhold Nelson, and by the omission of the clause beginning with the words "deducting, however" and continuing down to and including the words "such work relief projects", is granted but otherwise denied.

Enforcement of 2(e) (1) is granted but only to the extent that it provides for notice that the respondent will cease and desist as provided in paragraph 1(a) of the order and will take the affirmative action specified in 2(c) and 2(d) as modified above.

Enforcement of 2(e) (2) and 2(e) (3) is denied and of 2(f) and 2(g) is granted in respect to notices under paragraphs 1(a) and 2(c) and 2(d) as modified.

CLARK, Circuit Judge (dissenting in part).

On June 7, 1937, the C.I.O. organizing committee first met with Superintendent Nelson, who stated respondent's position meticulously for an open shop and no union solicitation on the premises. On June 14, Wise, an old employee, started organizing the Independent Council, and on June 18, he wrote to Nelson, making a claim to a majority of the workers. This Nelson accepted; for, following a membership meeting of the Council held June 28—substantially dominated by Wise—the latter wrote Nelson on June 30 as chairman of "the Committee presented to you and *accepted by you* as a bargaining group" (emphasis supplied), asking for wage arrangements and a conference. Though the C.I.O. organizers distributed handbills and publicly charged that the Council was company dominated, Nelson met the Committee July 1, and on July 2 posted a most important notice on the bulletin board definitely accepting the Council as "representatives of employees" and informing the workers that a contract with it was being negotiated. This notice was brilliantly timed to give employer support to the Council's campaign at a crucial moment, before it was shown to have a majority of the workers. It is admitted that the peak of the C.I.O. membership was on June 30, when it was claimed to have a total of between 180 to 194. Though the C.I.O. organizer tried on July 1 to arrange a meeting with Nelson, none was held until July 8, when the C.I.O. committee claimed a majority and offered to have the question determined by the Board. But Nelson was then sure the Council had the majority and agreed with the latter that night and signed the contract the next day, July 9, when the Council produced cards for 220 or a majority of the employees. The cards were not checked, though it is clear that some employees had signed cards for both organizations and a considerable number were on the fence. Hence the notice of July 2 could have turned, and very likely did turn, the scales in favor of the Council, at the very time when the C.I.O. was conducting a successful campaign at another plant across the street.

When Nelson recognized the Council on June 18 and July 2, he did not and could not know whether it represented a majority. In view of this decisive act I do not see how we can say the Board had no substantial evidence to sustain its findings. But there was more. The workers were told in the campaign that respondent had previously employed labor spies, as the Senate investigating committee had discovered; the keymen, found by the Board to be supervising employees, were behind the Council; their solicitation on the premises was active and extensive, notwithstanding Nelson's general notice to the contrary, while that of the C.I.O. on the premises was limited and casual; and there was the testimony of pressure against the C.I.O. and for the Council from Machine Superintendent Wallicki and from Lundquist, whose supervisory position was not controverted in the testimony, as well as the discharges of Fidellow and Raue. I think the workers would have been naive—as they were not—to fail to see where employer pressure directed them; at any rate, "the whole congeries of facts before the Board supports its findings." National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 361, 85 L. Ed. 368. We ought not to substitute our judgment for the Board's, ibid.; National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704, and the orders for disestablishment of the Council should be enforced.