345 F.2d 264
 AMALGAMATED CLOTHING WORKERS OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
EDRO CORPORATION and Anasco Gloves, Inc., Respondents.
 No. 264.
 No. 265.
 Docket 29097.
 Docket 29131.
 United States Court of Appeals Second Circuit.
 Argued February 15, 1965.
 Decided May 11, 1965.
 
 Jacob Sheinkman, Joel Field, New York City, for Amalgamated Clothing Workers.
 Michael N. Sohn, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Washington, D. C., Atty.), for National Labor Relations Board.
 Denetrio Fernandez, Luis E. Garcia Benitez, San Juan, P. R., for Edro Corp. and Anasco Gloves, Inc.
 Before WATERMAN, FRIENDLY and HAYS, Circuit Judges.
 WATERMAN, Circuit Judge.
 
 
 1
 Pursuant to a charge by the Amalgamated Clothing Workers of America, the National Labor Relations Board found that Edro Corporation and Anasco Gloves, Inc. had violated Sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (5). The decision and order of the Board are reported at 147 N.L.R.B. No. 107. In Docket No. 29097, Amalgamated petitions this court to modify the Board's order so as to provide for more extensive relief. In Docket No. 29131, the Board petitions for enforcement of its order, and Edro cross-petitions to have the order set aside.
 
 
 2
 Amalgamated is a "person aggrieved" under Section 10(f) of the Act. Local 282, Int'l Bhd. of Teamsters, etc. v. NLRB, 339 F.2d 795, 799-800 (2 Cir. 1964). It has its headquarters and principal office in New York City, within this judicial circuit. Consequently the union's petition is properly before our court. On the other hand, Edro is incorporated and has its principal place of business in Puerto Rico, and most of the alleged unfair labor practices occurred there. Ordinarily the Board's petition under Section 10(e) of the Act would therefore have been presented to the Court of Appeals for the First Circuit. Nevertheless, and on this point all parties are in agreement, we may take jurisdiction of the entire controversy, so that it can be settled in a single proceeding. Confectionery & Tobacco Drivers and Warehousemen's Union, etc. v. NLRB, 312 F.2d 108, 111 (2 Cir. 1963).
 
 
 3
 We hold that Edro was accorded a fair hearing by the trial examiner and that, within the principles of Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the following findings of fact were supported by substantial evidence.
 
 
 4
 On October 8, 1962, Amalgamated held authorization cards signed by a clear majority of Edro's employees. The regional director of the union informed the company's general manager of this fact and asked for collective bargaining. The general manager replied that he could do nothing without instructions from his superiors. Thereupon the assistant secretary-treasurer of Amalgamated contacted Edro's president to request the company to recognize and bargain with the union. The president expressed doubts that Amalgamated represented a majority of Edro's employees. He refused the union's offer to submit the cards to a neutral examiner and rejected the union's proposal that a consent election be held. Subsequently he also informed the assistant secretary-treasurer of the union that if Amalgamated continued to press for recognition at the plant in Puerto Rico it would be shut down, and that if the Board obliged him to bargain with Amalgamated the ensuing negotiations would be fruitless.
 
 
 5
 Amalgamated filed charges with the Board, alleging that Edro, in violation of Section 8(a) (5) of the Act, had refused to bargain. After further discussions between the union and the company, a consent agreement was signed on January 24, 1963, providing for an election under Board auspices. Amalgamated promised to withdraw its charge under Section 8(a) (5); Edro promised not to interfere with a free choice by its employees.
 
 
 6
 In the week preceding the election, agents of Edro asked various employees which way they were going to vote, warned them that the plant would be shut down if the union won, and promised them that if the union lost their wages would be raised $1 per hour and they would receive free insurance. Union officials did not learn of these activities until after the election. On February 4, 1963, Amalgamated was voted down by a decisive margin. Edro permitted its employees to celebrate the returns for an entire afternoon without loss of pay.
 
 
 7
 Amalgamated then renewed its charge before the Board that Edro had refused to bargain prior to the election, in violation of Section 8(a) (5) of the Act; and it added a charge that the company had interfered with its employees' rights to unionize, in violation of Section 8(a) (1). Outside the courtroom at a subsequent hearing before the trial examiner, Anasco's general manager told an employee that she was going to strike one of the Board's witnesses, and later she attempted to carry out her threat in the presence of other employees.
 
 
 8
 The Board, adopting the decision of its trial examiner, correctly ruled that Edro had violated Section 8(a) (1) by interrogating its employees in a coercive manner, by threatening them with reprisals if the union won, by promising them benefits if the union lost, by granting them benefits when the union did lose, and by inhibiting recourse to the Board for relief against unfair labor practices. E.g., NLRB v. Philamon Labs., Inc., 298 F.2d 176 (2 Cir.), cert. denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962); Bausch & Lomb Optical Co. v. NLRB, 217 F.2d 575 (2 Cir.1954); Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951). The Board also ruled correctly that Edro had violated Sections 8(a) (5) and (1) by refusing in bad faith to bargain with Amalgamated prior to the election. E.g., Edward Fields, Inc. v. NLRB, 325 F.2d 754, 760-61 (2 Cir. 1963); NLRB v. Philamon Labs, Inc., supra; Joy Silk Mills, Inc. v. NLRB, supra.
 
 
 9
 The Board ordered Edro to cease and desist from threatening its employees with removal of the plant if Amalgamated should win an election; from unlawfully interrogating its employees with regard to their unionism; from promising benefits to its employees in order to discourage membership in Amalgamated; and from otherwise violating Section 8(a) (1) of the Act. The Board also ordered Edro to bargain collectively with Amalgamated upon the union's request, and to post the customary notices for sixty days.
 
 
 10
 Edro objects to the Board's order that it bargain with Amalgamated, on the ground that the union never represented an uncoerced majority of its employees. The company claims that the union obtained the authorization cards by misrepresenting to its employees that the union already enjoyed majority support. We assume for the sake of the argument that such a falsehood would void the authorizations. Nevertheless, we cannot find in the record any intelligible evidence that the union organizers, falsely or otherwise, told employees whose signatures were being sought that Amalgamated already had majority endorsement.
 
 
 11
 Edro also bases its objection on the wording of the authorization cards: "Those joining now will never have to make an initial payment. Those who wait until the contract is signed will have to pay the regular initiation fees." The company claims that this statement constituted an additional misrepresentation, inasmuch as Amalgamated had no intention of collecting initiation fees from employees who joined the union after the contract was signed. For proof of its allegation regarding the union's intent, the company relies solely on the fact that in the autumn of 1960, two years before the campaign among Edro's employees, Amalgamated exacted no "regular initiation fees" in Puerto Rico. NLRB v. Gorbea, Perez & Morell, S. en C., 328 F.2d 679 (1 Cir.1964).
 
 
 12
 It is true that "when the existence of an object, condition, quality, or tendency at a given time is in issue, the prior existence of it is in human experience some indication of its probable persistence or continuance at a later period." 2 Wigmore, Evidence § 437, at 413 (3 ed. 1940). On the other hand, "the degree of probability of this continuance depends on the chances of intervening circumstances having occurred to bring the existence to an end." Ibid.
 
 
 13
 The Board had substantial evidence to support its finding that the presumption of continuing status was inapplicable in this case. Two full years had passed between the autumn of 1960 and the organizing campaign among Edro's employees, and in the meantime the Court of Appeals for the First Circuit had denounced the union's practice as deceitful. NLRB v. Gorbea, Perez & Morell, S. en C., 300 F.2d 886 (1 Cir. 1962). Under these circumstances, it was incumbent upon Edro to adduce additional evidence that Amalgamated was lying when it told Edro's employees in the autumn of 1962 that it intended to collect initiation fees from those who joined the union after the contract was signed.
 
 
 14
 Edro also claims that the waiver of initiation fees by Amalgamated, whether spurious or genuine, amounted to a buying of votes which nullified the authorization cards. The company relies heavily on the decision in NLRB v. Gorbea, Perez & Morell, S. en C., 328 F.2d 679 (1 Cir.1964). We are not at all certain that Gorbea condemned the union's waiver of fees apart from the misrepresentation already discussed. In any event, we must make our own determination on this issue.
 
 
 15
 We have no doubt that Amalgamated's waiver helped to induce Edro's employees to sign the authorization cards; but so did Amalgamated's promise to better their working conditions if it obtained majority status. The question remains whether the inducement was proper or improper. Id. at 681. We must consider, among other things, what justification there may have been for the waiver and the extent to which it foreclosed a rational decision on the part of the employees. Id. at 681-682.
 
 
 16
 We are satisfied that Amalgamated had a constructive reason to waive its initiation fees prior to the time when it signed a contract with Edro. Employees otherwise sympathetic to the union might well have been reluctant to pay out money before the union had done anything for them. Waiver of the payments would remove this artificial obstacle to their endorsement of the union. We are also satisfied that the waiver did not unduly pressure Edro's employees into signing up at once with Amalgamated. The authorization cards clearly stated that the waiver was effective until the union executed a collective bargaining agreement. This statement gave adequate notice to all employees, whether they approved or disapproved of the union, that they had nothing to lose by waiting for the union to achieve recognition before applying for membership. Accordingly, we hold that the waiver of initiation fees by Amalgamated in no way nullified the proof that it enjoyed majority support among Edro's employees prior to the election. NLRB v. Dahlstrom Metallic Door Co., 112 F.2d 756, 758 (2 Cir. 1940); NLRB v. Taitel, 261 F.2d 1, 4 (7 Cir.1958), cert. denied, 359 U.S. 944, 79 S.Ct. 725, 3 L.Ed.2d 677 (1959).
 
 
 17
 Amalgamated argues that the Board's order was inadequate to deter Edro from future unfair labor practices and to cure the animus against the union created among its employees by the company. However, the Supreme Court has repeatedly asserted the Board's broad discretion to fashion remedies based on its acquaintance with the situation at hand and its experience in promoting industrial peace. E.g., NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). We do not find that the Board abused its discretion in the present case.
 
 
 18
 Order enforced without modification.
 
 FRIENDLY, Circuit Judge (concurring):
 
 19
 I should not wish to be committed to a view that a union's use of an authorization card bearing a caption like that here employed could never relieve an employer of a duty to recognize a majority so procured or require invalidation of an election. Of course there is nothing wrong in a union's obtaining an authorization but deferring union membership and the payment of an initiation fee from anyone until it has established itself as a bargaining representative. Likewise there is nothing wrong in a union's offering to forgive initiation fees to those who join early, provided that the opportunity clearly remains open to everyone for a reasonable time after it has become entitled to recognition. But neither of these propositions leads to the conclusion that a union is not exerting improper influence if it waives fees for those who join immediately, while indicating that this advantage will be foreclosed to existing employees who have failed to anticipate and assist in accomplishing its victory. It is true that in this case the stated deadline was not the achievement of majority status or the winning of an election but the signature of a contract, which presumably would come somewhat later. A lawyer scrutinizing the card might consider himself thus protected against need of hasty action, although even he would feel much better if he were assured of some advance notice of the fall of the boom. But it is unrealistic to suppose that Puerto Rican glovemakers being solicited by union organizers would draw so nice a distinction. See NLRB v. Gorbea, Perez & Morell, S. en C., 328 F.2d 679, 682 (1 Cir.1964); NLRB v. Gilmore Industries, Inc., 341 F.2d 240 (6 Cir.1965). I am content, however, to leave resolution of that issue to a case where the union's majority was smaller than the 90 out of 120 here, and the employer's objection on this score was not so plainly an afterthought. Specification of what may and may not be said as to initiation fees on authorization cards would seem an appropriate field for use of the Board's rule-making power.