**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MAJESTIC WEAVING CO., Inc., Respondent,**

**Local 815, International Brotherhood of Teamsters, Intervenor.**

**No. 61, Docket 29601.**

United States Court of Appeals Second Circuit.

Argued Oct. 20, 1965.

Decided Jan. 4, 1966.

George B. Driesen, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Washington, D. C., Atty.), for petitioner.

Irving Rozen, New York City (Weisman, Allan, Spett & Sheinberg, Walter A. Stein, New York City, of counsel), for respondent.

Henry I. Hamburger, Nemeroff, Jelline, Danzig, Paley & Kaufman, New York City, for intervenor.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge:

The National Labor Relations Board petitions to enforce an order ruling that the respondent, Majestic Weaving Co., Inc., rendered unlawful assistance to a union attempting to organize its plant, executed an invalid union security agreement, and unlawfully refused to bargain with the proper representative of its employees. National Labor Relations Act §§ 8(a) (1), (2), and (5). Most of the General Counsel's claims were rejected by the Board and are not here at issue. The Trial Examiner's findings, which the Board adopted although disagreeing with his conclusion, can be briefly stated.

Majestic, a corporation newly organized for the production and distribution of printed fabrics, began hiring employees for a plant under reconstruction at Cornwall, N. Y., in February 1963. The employees were told they would first perform tasks necessary to getting the plant in operation; thereafter most of them would be trained in a number of finishing and printing skills, although some craftsmen who were adept as welders, pipefitters or electricians might continue as such. On February 13, Sanderman and Friedman, representatives of Local 815, International Brotherhood of Teamsters, visited the plant and told the manager, Thomasis, that the Local represented some of the employees. Thomasis called in Majestic's labor relations consultant, Hardy, who met with the union representatives that afternoon. Sanderman repeated that Local 815 had signed up some employees, desired recognition and would like to negotiate a contract. Hardy, explaining that Majestic was just getting started and had engaged only a dozen of its work force, said he had no objection to beginning to negotiate and discuss a proposed contract provided Local 815 could show at the conclusion that it represented a majority of the employees. Sanderman and Friedman asked if they could make a tour of the plant; Hardy assented and offered to take them through. Shortly thereafter Sanderman detached himself to talk to three employees, rejoined Hardy and Friedman, and then, having "spotted a gentleman who was a little bit older" than the other employees, left the group and introduced himself. He asked whether the gentleman, Weyant Felter, had been a member of the union and, on receiving an affirmative response, explained his mission. With the aid of Friedman who had also separated from Hardy, Sanderman persuaded Felter to act as temporary shop steward and get the employees to sign cards applying for membership in Local 815. During late February, March and early April, Felter went about his solicitation on behalf of the local, with considerable success. Since people were continuously being hired and employees of contractors were also on the premises, Felter occasionally asked Thomson, the Company's personnel manager, to point out who were the new Majestic employees and introduce him. When Felter was talking to the employee,

Thomson would walk away, or sometimes remain "in the vicinity," though not within hearing distance, in order to be available to point out someone else. Meanwhile four conferences were held between Sanderman, Friedman and Felter for the Union, and Hardy and, on some occasions, Thomasis for the Company. On April 26, a typical collective bargaining agreement, containing a union security clause as authorized by § 8 (a) (3) of the National Labor Relations Act, was executed; it was effective as of February 14, 1963, and was to terminate on December 1, 1965. Prior to the signing of the agreement the Union presented authorization cards signed by 26 of the 37 persons then employed.

On May 22, a representative of the Textile Workers Union met with five Majestic employees and persuaded them to sign membership cards and undertake to get others signed. By May 28, their efforts produced some 34 signed cards out of a force of about 45, and the union filed a petition for election with the National Labor Relations Board. On the same day, stating that it now represented a majority of the employees, the Textile Workers requested that Majestic meet with them to negotiate a collective bargaining agreement. When this demand was rejected on the ground that the Company already had an exclusive agreement with Local 815, the union filed an unfair labor practice charge, alleging that Majestic had entered into a "collusive contract with the Teamsters Union * * * for the express purpose of preventing the workers from picking a bargaining agency of their own choice," and that the agreement was executed "on February 14, 1963, at which time the Company employed approximately 4 people and there was not a single piece of equipment in operation." The complaint, issued by the General Counsel after the filing of a second charge, also alleged that the agreement with Local 815 was executed on or about February 14; it

claimed, in addition to specific acts alleged to constitute unlawful assistance to Local 815, that at the time Majestic did not have a representative complement in its employ and that Local 815 was not duly designated by an uncoerced majority.

The Trial Examiner found that the contract was in fact executed on April 26 and that on this date Majestic had employed at least 30% of its ultimate complement and had employees working within at least 50% of the ultimate job categories, thus satisfying the established test for determining the stage at which a binding contract may be signed on behalf of all present and future employees. See General Extrusion Co., 121 N.L.R.B. 1165 (1958). Concluding also that the other charges of unlawful assistance had not been established, he recommended that the complaint be dismissed. The Board, acting through a three-member panel, accepted the Examiner's report in largest part but reached a different ultimate conclusion. It held that the solicitation by Felter constituted unlawful assistance in violation of § 8 (a) (2) since at the time Felter was working "in a lead capacity for the general laborers then being hired" and had received the cooperation of Thomson. It also found unlawful assistance in the very act of negotiating a contract with Local 815 as the exclusive representative of the employees before the union had achieved majority status, even though on the understanding that execution of any agreement depended on the union's having attained that goal. In arriving at this conclusion, which was thought to be a logical or even necessary corollary of International Ladies Garment Workers Union, etc., v. NLRB (Bernhard-Altmann), 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961), the panel was obliged to overrule the Board's long-standing decision permitting such conditional negotiation, Julius Resnick, Inc., 86 N.L.R.B. 38 (1949),[1] and to override

---

1. The Board there stated:
    Furthermore, while there are indications that the Respondent and the Independent may have agreed to the terms of their contract before the Independent had organized the Respondent's em-

the objection that no such issue had been posed by the complaint. Finally, the panel held that since the contract with Local 815 had thus resulted from violations of § 8(a) (2), execution of the agreement unlawfully interfered with employees' rights protected by § 8(a) (1), that it consequently afforded no justification for refusing to bargain with the Textile Workers, and that Majestic had thus violated § 8(a) (5). The order issued by the Board directed the Company, *inter alia,* to cease and desist from giving any effect to the agreement with Local 815 "or to any modification, extension, renewal or supplement thereto" and from refusing to bargain with the Textile Workers as the exclusive representative of the employees; to withdraw recognition from Local 815 unless and until the latter was certified by the Board; and to bargain with the Textile Workers. In a supplemental decision, the panel denied petitions for reconsideration by Majestic and Local 815, which, though not named as a respondent, was a party by virtue of the Board's Rules and Regulations, § 102.8, 29 C.F.R. § 102.8 (1965), see NLRB v. Majestic Weaving Co., 344 F.2d 116 (2 Cir. 1965), and ordered Majestic to reimburse all employees who by petition had protested the deduction of dues and initiation fees payable to Local 815.

## I.

■ The conclusion that the activities of Felter and Thomson constituted unlawful assistance to Local 815 is not supported by substantial evidence on the record as a whole.

Weyant Felter was a pipefitter and boiler-operator receiving an hourly wage and punching a time clock. He would start the boiler and compressors on coming to work, watch them for an hour or two, and close them down at the end of the day. For the rest of the time he engaged in "pipe work" as directed by supervisors, being assigned such helpers, from one to three or four, as the particular job required. On a very few occasions, when a supervisor knew he would be late in getting to work, Felter would be told to show two or three of the employees what jobs were to be done. Felter was without authority, real or apparent, to hire or fire other employees or to act in any general supervisory capacity on behalf of the Company.

■ It is true, as counsel for the Board says, that § 8(a) (2) may be violated by organizing activities of an employee in a position of authority for which the employer may fairly be held responsible, even though it has not in fact authorized them and the employee did not have the power to hire or fire, see International Ass'n of Machinists v. NLRB, 311 U.S. 72, 79–81, 61 S.Ct. 83, 85 L.Ed. 50 (1940); H. J. Heinz Co. v. NLRB, 311 U.S. 514, 518–521, 61 S.Ct. 320, 85 L.Ed. 309 (1941); NLRB v. Link-Belt Co., 311 U.S. 584, 598–599, 61 S.Ct. 358, 85 L.Ed. 368 (1941). But the reason for this rule, namely, that the rank and file may have just cause to regard such activities as representing the employer's will or desire, NLRB v. Link-Belt Co., supra, also sets its limits. And, in practical application, due weight must also be given to competing values; if senior men "were not to be free to express their opinions and to urge fellow-workmen to organize in a certain way, the interest and activity of the most competent men in the appropriate bargaining group would be eliminated." NLRB v. Arma Corp., 122 F.2d 153, 156 (2 Cir. 1941).

On the facts of this case no reasonable basis can be found for inferring that the workers would have considered or had just cause to consider Felter's organizing activities to be at the instance of management. The only thing that set Felter

---

ployees, and the Respondent did in fact act precipitately in signing the contract in the face of A. F. of L. objections and charges, the Respondent's action did not constitute a violation of the Act, because the Independent represented a majority of the Respondent's employees when the contract was executed on March 3, 1948. 86 N.L.R.B. at 39.

apart in any way was that he was older than many of the employees and more experienced in pipe work, so that he was the senior man or straw boss when a pipe job had to be done. On the basis of this alone, the employees could not reasonably have thought that Felter was acting for Majestic, see NLRB v. Arma Corp., supra at 156; NLRB v. Newton Co., 236 F.2d 438, 442 (5 Cir. 1956); cf. NLRB v. Griggs Equipment, Inc., 307 F.2d 275, 279 (5 Cir.1962), or that the Company would then have interfered with an employee of similar status soliciting on behalf of another union or arguing against any union at all. See Ballston-Stillwater Knitting Co. v. NLRB, 98 F.2d 758, 762 (2 Cir. 1938); NLRB v. Newton Co., supra, 236 F.2d at 442. The employees could hardly have considered it unusual that Local 815 in its effort to organize the plant should have enlisted the help of a senior employee rather than that of a younger man. And once it is recognized that Felter's organizing activities of themselves cannot fairly be attributed to Majestic, the minor help rendered by Thomson, the personnel manager, is not enough to tip the scale and satisfy the General Counsel's burden of proof. His identification of the new employees was a normal courtesy, especially appropriate under circumstances where they were mingled with the employees of contractors; an employer is hardly to be faulted for failure to make life difficult for an employee endeavoring to organize his fellows.

The case for enforcement of the Board's order on this ground is further weakened by the Trial Examiner's conflicting conclusion that Felter, even with Thomson's insignificant assistance, could not be considered to have been acting on behalf of the Company. To be sure, the issue here did not turn on credibility, as to which the weight to be given such a finding by a hearing officer attains its maximum, Universal Camera Corp. v. NLRB, 340 U.S. 474, 496–497, 71 S.Ct. 456, 95 L.Ed. 456 (1951), but on the inference reasonably to be drawn from conduct not in serious dispute.

Yet, on such an issue also, observation of the witnesses is likely to give a more accurate feel than reading a cold record; something would depend on what manner of man Felter was, and whether the testimony as to Thomson's activities carried true conviction. The Trial Examiner had "lived with the case"—an opportunity not vouchsafed to the Board, and his conflicting report carries some weight against the existence of substantial evidence to support the Board's conclusion. See Universal Camera Corp. v. NLRB, supra at 492–497, 71 S.Ct. 456.

II.

Having rejected the finding that Felter's organizing activities constituted unlawful assistance, we turn to the other basis for decision—that negotiation with a minority union of an agreement purporting to bind all employees, although conditioned on the union's achieving majority status before execution, was itself a violation of §§ 8(a)(1) and (2). We can begin by narrowing the area of debate. The Board no longer maintains that its overruling of the long-standing Resnick decision permitting such conditional negotiation, see fn. 1, was compelled by the Supreme Court's holding that the execution of an agreement recognizing as exclusive bargaining representative a minority union, mistakenly believed to represent a majority, is an unfair labor practice under §§ 8(a)(1) and (2). International Ladies Garment Workers Union, etc. v. NLRB (Bernhard-Altmann), 366 U.S. 731, 81 S.Ct. 1603 (1961). Its position is rather, as it has stated elsewhere, that "the premature grant of exclusive bargaining status to a union," even if conditioned on attainment of a majority before execution of a contract, is similar to formal recognition "with respect to the deleterious effect upon employee rights." 29 NLRB Ann. Rep. 69 (1964).

On our part, we would entertain no difficulty if the Board, after appropriate proceedings, should fashion for prospective application a principle along the general lines of that adopted here; rational basis plainly exists for some such

specification of the language of § 8(a)(2) even in cases like this where no other union was on the scene when the negotiations occurred. The problem arises from the Board's attempt to achieve its desire by a shorter road and in a more summary fashion.

■ ■ There has been increasing expression of regret over the Board's failure to react more positively to the Supreme Court's rather pointed hint, SEC v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947),[2] that since an administrative agency has "the ability to make new law prospectively through the exercise of its rule-making powers, it has less reason [than a court] to rely upon *ad hoc* adjudication to formulate new standards of conduct," and that the "function of filling in the interstices" of regulatory statutes "should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future." See, e. g., NLRB v. A. P. W. Prods. Co., 316 F.2d 899, 905 (2 Cir. 1963); Amalgamated Clothing Workers of America, AFL-CIO v. NLRB, 345 F.2d 264, 269 (2 Cir. 1965) (concurring opinion); International Union of Operating Eng'rs, Local 49, etc. v. NLRB, 353 F.2d 852 (D.C.Cir. 1965).[3] Although courts have not generally balked at allowing administrative agencies to apply a rule newly fashioned in an adjudicative proceeding to past conduct, a decision branding as "unfair" conduct stamped "fair" at the time a party acted, raises judicial hackles considerably more than a determination that merely brings within the agency's jurisdiction an employer previously left without, see NLRB v. Pease Oil Co., 279 F.2d 135, 137–139 (2 Cir. 1960), or shortens the period in which a collective bargaining agreement may bar a new election, see Leedom v. International Bhd. of Elec. Workers, 107 U.S. App.D.C. 357, 278 F.2d 237, 243 (1960), or imposes a more severe remedy for conduct already prohibited, see NLRB v. A. P. W. Prods. Co., supra. And the hackles bristle still more when a financial penalty is assessed for action that might well have been avoided if the agency's changed disposition had been earlier made known, or might even have been taken in express reliance on the standard previously established. See NLRB v. International Bhd. of Teamsters, 225 F.2d 343 (8 Cir. 1955); NLRB v. E & B Brewing Co., 276 F.2d 594, 600 (6 Cir. 1960), cert. denied, 366 U.S. 908, 81 S.Ct. 1083, 6 L.Ed.2d 234 (1961).

■ It must be recognized that "every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency," and that, generally speaking, "the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency," SEC v. Chenery Corp., supra, 332 U.S. at 203, 67 S.Ct. at 1580. But the problem of retroactive application has a somewhat different aspect in cases not of first but of second impression, where an agency alters an established rule defining permissible conduct which has been generally recognized and relied on throughout the industry that it regulates. As a result of the nature of the task Congress has confided to the agencies and the vagueness of the directions it has given, they are, and ought to be, much likelier to engage both in new departures and in alterations than courts with their more limited "molecular motions," Southern Pac. Co. v. Jensen, 244 U.S. 205, 221, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (dissenting opinion of Mr. Justice Holmes);

---

2. Although this was specifically addressed to the SEC with respect to the Public Utility Holding Company Act, we see no reason for doubting it was intended to have general applicability.

3. See also Professor Peck's illuminating article, The Atrophied Rule-Making Powers of the National Labor Relations Board, 70 Yale L.J. 729 (1961); Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards 145–47 (1962); and 1 Davis, Administrative Law Treatise § 6.13, at 147–50 (1965 pocket part).

and this makes it peculiarly important for them to take full advantage of their power to act prospectively, whether by rule-making or adjudication. In this case, we might well conclude that where for fifteen years the Board considered conditional negotiation consistent with the statutory design "the ill effect of the retroactive application of a new standard" so far outweighs any demonstrated need for immediate application to past conduct, SEC v. Chenery Corp., supra, 332 U.S. at 203, 67 S.Ct. at 1581, as to render the action "arbitrary." APA § 10(e), 5 U.S.C. § 1009(e). However, we do not need to decide that serious substantive issue, since we deny enforcement on a procedural ground.

The complaint issued by the General Counsel gave no notice that the mere fact of negotiation with Local 815 was claimed to constitute unlawful assistance. It charged, in addition to the specific acts of Felter, Thomson and others, only that Majestic and Local 815 had executed a collective bargaining contract on or about February 14, 1963, although Majestic "did not have a representative complement of employees in its employ at the time of such execution, and notwithstanding the fact that Local 815 was not at the time of the execution thereof, nor at any time herein material, duly designated or selected as their collective bargaining representative by an uncoerced majority of the employees covered by such agreement." The complaint cannot fairly be read as tendering the issue that the union lacked majority status at the time of negotiation, with consequent illegal assistance even though majority status had been achieved by the time of execution. Indeed, the Board does not assert that it can be. Admitting that the point was first raised in General Counsel's brief to the Trial Examiner, after the hearing had demonstrated that the agreement was not signed until April 26 when Local 815 had authorizations satisfying the Board's standards, the Board insists that no prejudice has been shown since Majestic failed to request an opportunity to offer further evidence then

or later, and indeed could not have presented any which would affect the application of what is considered a *per se* rule to allegedly undisputed facts.

We do not find the argument persuasive. Section 5 of the APA, 5 U.S.C. § 1004, provides that "In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing * * * (a) Persons entitled to notice of an agency hearing shall be timely informed of * * * (3) the matters of fact and law asserted." In commendable conformity with this mandate and with the National Labor Relations Act § 10(b), the Board's Rules and Regulations § 102.15, 29 C.F.R. § 102.15 (1965), require a complaint to contain "a clear and concise description of the acts which are claimed to constitute unfair labor practices, including, where known, the approximate dates and places of such acts and the names of respondent's agents or other representatives by whom committed." See Douds v. International Longshoremen's Ass'n, 241 F.2d 278, 283 (2 Cir. 1957). As this recognizes, the time for giving notice of the matters of fact and law asserted is prior to the hearing, not in what the Board calls "General Counsel's post-complaint theory of the case" unveiled in a post-hearing brief.

Where an agency determination is made under the latter circumstances and goes beyond the issues framed by the complaint, a serious question must arise whether a respondent has not been denied a full and fair hearing on the unlawful conduct with which it has been charged. See NLRB v. Bradley Washfountain Co., 192 F.2d 144, 149 (7 Cir. 1951); Douds v. International Longshoremen's Ass'n, supra, 241 F.2d at 283–284; NLRB v. E & B Brewing Co., 276 F.2d 594, 598–599 (6 Cir. 1960), cert. denied, 366 U.S. 908, 81 S.Ct. 1083 (1961); Northeastern Indiana Bldg. & Constr. Trades Council v. NLRB, 352 F.2d 696 (D.C.Cir. 1965). In this case, because the focus of the hearing was on the date of execution of the collective bar-

gaining agreement and the union's representative status at that time, the evidence concerning the negotiations was at most incidental. The record does not disclose when Local 815 achieved a majority status conforming with the Board's standards or that negotiation on the basis of its being the exclusive representative antedated its attaining that position. The Company thus had no opportunity to show at the hearing that it had not violated even the new rule later announced. See NLRB v. H. E. Fletcher Co., 298 F.2d 594, 600 (1 Cir. 1962).[4]

■ ■ The vice arising from the lack of notice and proper hearing is not to be overcome by insistence that Majestic should have sought leave to introduce further evidence. When the new issue was raised after the hearing, the burden of seeking a reopening rested on the General Counsel who sought to raise the new issue, not on Majestic; at that stage the Company was entitled to stand on the Resnick decision, as it did with success before the Trial Examiner, and also on its procedural rights. After the Board had announced its new rule, Majestic made sufficient objection by urging in its petition for reconsideration that the facts underlying the decision had

not been fully litigated; and it was justified in adhering to its legal position without diluting its substantive and procedural arguments by asking for a new hearing which would in effect have represented consent to belated amendment of the complaint. At least under the circumstances of this case, where the Board has admittedly altered its standard of required conduct in response to a post-hearing brief, it suffices that Majestic can direct the attention of a reviewing court to evidence it might have been able to offer in answer to a proper complaint.[5]

■ The Board urges that, on this view of the case, we should remand rather than deny enforcement. Assuming that the apparent bar arising from the provision in § 10(b) which permits amendment of a complaint only "at any time prior to the issuance of an order based thereon," could be surmounted by our vacating the order, we see no good reason to permit the Board to start afresh. The alleged unfair labor practice is nearly three years old, the offending contract with Local 815 has already expired, and we assume that only the pendency of this proceeding prevents a new election.[6]

Enforcement denied.

4. We also think it highly undesirable for an agency to announce a new *per se* rule without *either* a rule-making *or* an evidentiary hearing, thereby denying itself the light on the proper content of the rule which such proceedings would afford. We cannot tell, for example, how far the new rule depends on knowledge of the negotiation by the employees, or whether a full disclosure of the condition to them would save the situation. A hearing would have focused attention on whether these elements ought not to be included, either as a matter of policy or to overcome possible doubt whether their absence might not render the rule invalid. Of course, if either or both of these elements should ultimately become components of the new rule, the lack of a proper hearing would be even more consequential than we have intimated.

5. NLRB v. E & B Brewing Co., 276 F.2d 594, 598–599 (6 Cir. 1960), cert. denied,

366 U.S. 908, 81 S.Ct. 1083 (1961), would indicate that not even that is required. We do not read NLRB v. Bradley Washfountain Co., 192 F.2d 144, 149–150 (7 Cir. 1951); NLRB v. Puerto Rico Rayon Mills, Inc., 293 F.2d 941, 947–948 (1 Cir. 1951), or other decisions cited by the Board, as ruling otherwise. We consider the instant case more nearly analogous to NLRB v. H. E. Fletcher Co., 298 F.2d 594 (1 Cir. 1962), and NLRB v. Johnson, 322 F.2d 216 (6 Cir. 1963), cert. denied, 376 U.S. 951, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964).

6. Decisions that when an employer has been proved to have unlawfully undermined a union entitled to recognition, a court may not condition enforcement of a valid Board order requiring recognition on a new election, see NLRB v. Katz, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), and cases there cited, differ *toto caelo*.