880 F.2d 1396
 131 L.R.R.M. (BNA) 3201, 279 U.S.App.D.C. 323,
112 Lab.Cas. P 11,380
 Florence J. HICKS, d/b/a Ebon Research Systems, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
American Federation of Government Employees, Local 3430,
AFL-CIO, Intervenor.
 No. 88-1625.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 17, 1989.
Decided July 28, 1989.
 
 Robert L. Ackerly, with whom Claude Roxborough was on the brief, for petitioner.
 Scott D. Macdonald, Atty., N.L.R.B., with whom Peter Winkler, Supervisory Atty., Robert E. Allen, Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on the brief, for respondents.
 Mark D. Roth and Kevin M. Grile, Washington, D.C., were on the brief for intervenor.
 Before ROBINSON, BUCKLEY and WILLIAMS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 Dr. Florence J. Hicks, doing business as Ebon Research Systems, provides research services to government agencies, including the National Institute of Occupational Safety and Health. In the present case the work was performed at NIOSH's Morgantown, West Virginia facility, with Ebon acting as a subcontractor for the Small Business Administration; the work largely revolved around the management of animals used by NIOSH in its testing efforts. Some of Ebon's Morgantown employees started a unionization campaign, which they pursued with the aid of Local 3430 of the American Federation of Government Employees, an intervenor here. Dr. Hicks opposed the effort, taking steps that an administrative law judge at the National Labor Relations Board found to constitute unfair labor practices, after having concluded that the Board had jurisdiction. On appeal by Hicks, the Board remanded the case to the ALJ for reconsideration of the jurisdictional issue in the light of its intervening decisions in Res-Care, Inc., 280 NLRB 670 (1986), and Long Stretch Youth Home, Inc., 280 NLRB 678 (1986). The ALJ again found jurisdiction, and this time the Board affirmed, limiting its discussion of jurisdiction to a half-page footnote. Hicks v. AFGE Local 3430, 290 NLRB No. 84 (1988). Because the Board has offered no intelligible way of reconciling the present decision with the rule of those cases, we remand the case for reconsideration and a more adequate explanation. We do not rule on the unfair labor practice issues.
 
 
 2
 In National Transportation Service, 240 NLRB 565 (1979), the Board adopted a new test for jurisdiction: it would not exercise authority over an employer performing services for an exempt entity if the employer's arrangement with the exempt entity so limited the employer's control over its workers' employment conditions (especially wages) that it was unable to bargain collectively with a union representative. The apparent logic of the test, as it ultimately emerged in Res-Care and Long Stretch, was that if the employer, as to wages, acts as little more than a piece of carbon paper through which the exempt entity's wage decisions are transmitted to the employees, then any apparent collective bargaining by the employer would in substance be with the (supposedly) exempt entity.
 
 
 3
 The employer in Res-Care ran a job corps center under contract to the Department of Labor. Res-Care had a cost-plus-fixed-fee contract, which was derived from a line-item operating budget submitted by the company to the Department. Res-Care was also required to submit schedules setting out its job classifications and salary scales, including minimum and maximum wage rates for each job. Once the Department approved the wage ranges and the budget, the proposed numbers became the contract price; any alterations required Labor Department approval. The employer submitted monthly vouchers claiming reimbursement. If the vouchers reflected wages paid in excess of the maximum allowable rate, the Department was free to reject the excess and deduct it from the reimbursement sought. 280 NLRB at 671, 673. Thus if Res-Care skimped on one set of costs in order to raise wages, the Department of Labor could cut its reimbursement on the skimped areas but decline to raise the reimbursement for wages.
 
 
 4
 The Board ruled that Res-Care lacked the requisite autonomy: "In every sense, it is DOL, not Res-Care, which retains ultimate discretion for setting wage and benefits levels of the job corps center...." Id. (footnote omitted). In so finding, and despite more sweeping dicta earlier in the opinion, the NLRB noted that "without denigrating the importance of other personnel-related issues, we hold that if an employer does not have the final say on the entire package of employee compensations, i.e., wages and fringe benefits, meaningful bargaining is not possible." Id. at 674. The Board explicitly held that a key factor in the control determination was the "direct limits on employee compensation ... and not the fact that DOL places an effective ceiling on such expenditures by limiting Res-Care's total budget." Id. at 674 n. 22.
 
 
 5
 In Long Stretch, handed down on the same day as Res-Care, the Board identified at least some limits to Res-Care. Long Stretch provided residential care for children in Maryland under contract with the state. The state scheme required initial licensing by the state, "reevaluation" (evidently annual, see 280 NLRB at 681), and annual submission of a proposed operating budget. For initial licensing and reevaluation Long Stretch submitted proposed salary ranges and benefit levels. The state licensing agency reviewed those with a very light touch, apparently looking only for "grossly unfair" salaries, presumably suggestive of a Dickensian atmosphere. The agency also reviewed benefits, but only to be sure that certain types were supplied, regardless of level. Long Stretch submitted its budget separately, and the agency used it, together with those of the 49 other similar care providers, to propose a budget to the Maryland General Assembly. On the basis of the Assembly's funding, the agency would then select a per child sum for reimbursement. These payments supplied nearly all of Long Stretch's gross income. Id. at 678.
 
 
 6
 As the Board pointed out in its Long Stretch decision, the state's control over Long Stretch's wages and benefits was far looser and less direct than Labor's control over Res-Care's. Monitoring in the licensing and reevaluation process did not relate to amounts, except for some concern over extreme cases. Id. at 681. Long Stretch's budget submission related only indirectly to its actual reimbursement, as it eventuated, after consideration of 49 others' budgets, simply in a per child stipend. Id. at 682. Although the Board did not spell the point out, it is clear that Long Stretch could shift resources between wages and other costs without effect on its profit or the consent of the state agency. The Board found jurisdiction.
 
 
 7
 While the record before us as to the Ebon contracts is obscure, the natural inference seems to place the firm on the Res-Care side of the line. Clause 3 of the Department of Health, Education and Welfare's General Provisions for Negotiated Cost-Plus-Fixed-Fee Type Contract, incorporated by reference into the controlling contracts (see Joint Appendix ("J.A.") 14-15, 62-63, 68), provides that
 
 
 8
 the Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the estimated cost set forth in the Schedule ... unless and until the Contracting Officer shall have notified the Contractor in writing that such estimated cost has been increased....
 
 
 9
 J.A. 80, 83. The "Schedule" appears to have been composed (at least in part) of the budget, submitted by Hicks and incorporated into the NIOSH subcontracts, specifying precise compensation rates and estimated total hours. J.A. 78. The clause thus suggests that if Dr. Hicks agreed to a wage increase and hoped to finance it out of economies in non-wage costs, she could not do so without government approval; the government could adjust down for the savings but not up for the raises. This looks like Res-Care.
 
 
 10
 The Board and the intervenor union offer three justifications for the Board's action. First, they seem to assert that Hicks is incorrect in claiming that she lacked the ability to shift among costs without consent. The difficulty with the argument is that Clause 3, on what appears by far the most likely interpretation, indicates otherwise.
 
 
 11
 A variation on this is the argument that approval is readily granted, a claim based on testimony that "[n]ormally" the contracting officer will approve wage increases that arise out of a bona fide collective bargaining agreement, so long as they are "reasonable within the skills and the geographic area." J.A. 464-65. The ALJ appears not to have regarded this as having great weight, as he found that to obtain more money for wages Ebon "was required to convince the appropriate Contract Officer that approval ... was in the interest of the government." J.A. 20. The Board made no finding on the point. Res-Care in fact seemed to turn on the Labor Department's "retain[ing] ultimate discretion," which would be true even if it were normally exercised to allow reimbursement for collectively bargained wage hikes. While one can imagine a variation on Res-Care under which the required employer flexibility was grounded in the exempt entity's pliability, the Board has not advanced such a variation and the record contains no finding that would clearly support its application here.
 
 
 12
 Second, the Board and union assert that Hicks could use her "profit" from the fixed fee portion of the contract price to raise her employees' compensation levels. Both the ALJ and the Board appear, indeed, to have relied on this for their view that Ebon could reallocate resources. See J.A. at 3 n. 5 (Board), 14 (ALJ). But this was equally true in Res-Care, and there the Board explicably rejected the idea that it provided enough flexibility:
 
 
 13
 Although theoretically Res-Care could increase the compensation of employees from its own funds, it has chosen not to do so.... As DOL retains the ultimate discretion to determine wages and benefits, Res-Care's theoretical ability to absorb increases that are not approved by DOL does not affect our determination.
 
 
 14
 280 NLRB at 674 n. 21. Since any firm would have this option (except perhaps one in or on the verge of bankruptcy, or one subject to affirmative government penalties for increasing its employees' compensation or otherwise improving their conditions), Board reliance on it to establish an employer's independence of the exempt entity would gut the Res-Care standard.
 
 
 15
 Finally, AFGE draws our attention to the Service Contract Act of 1965, 41 U.S.C. Sec. 351 et seq. (1982). It asserts that the Act provides automatically for the incorporation, into the terms of existing government contracts subject to the Act's provisions, of any pay increases derived from collective bargaining. The specific basis for the union's theory is Sec. 351(a)(1), which requires covered contracts to include a provision specifying "the minimum monetary wages to be paid," either "as determined by the Secretary [of Labor]," or
 
 
 16
 where a collective-bargaining agreement covers any such service employees, in accordance with the rates for such employees provided for in such agreement, including prospective wage increases provided for in such agreement as a result of arm's length negotiations.
 
 
 17
 We find AFGE's construction of Sec. 351(a)(1) long on creativity but short on plausibility. On its view, Congress has provided a means whereby a firm specializing in government contracts could lawfully agree with its workers to milk the government without limit and at no expense to the employer. A far more natural reading is that the section incorporates into government contracts wage provisions that at the time of contracting have already been embodied in a collective bargaining agreement and are therefore subject to scrutiny by the contracting officer. Not surprisingly the Board never adopted the AFGE theory in its decision or even its brief; at oral argument its counsel did so, but with a reservation that under Res-Care is fatal to its position here: that any pass-through of resulting wage changes would be subject to approval by the contracting officer.
 
 
 18
 The Board has revealed no reasoning by which to fit its extension of jurisdiction to Ebon within its Res-Care doctrine. We therefore remand the case to the Board, for further action either consistent with its existing precedents or for generation of a new jurisdictional rule. Compare NLRB v. Majestic Weaving Co., 355 F.2d 854, 860 (2d Cir.1966) (discussion by Friendly, J., for the court, of limits on retroactive decisionmaking by Board).
 
 
 19
 So ordered.