The **PRUDENTIAL INSURANCE COM-PANY OF AMERICA**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent,

and

**Insurance Workers International Union, AFL–CIO**, Intervenor.

Nos. 488, 489, Dockets 32936, 33069.

United States Court of Appeals
Second Circuit.

Argued April 10, 1969.

Decided May 2, 1969.

Jerome Ackerman, Washington, D. C. (Thomas R. Haggard, Covington & Burling, Washington, D. C., on the brief), for petitioner.

Paul J. Spielberg, Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Robert E. Williams, N. L. R. B., on the brief), for respondent.

Isaac N. Groner, Cole & Groner, Washington, D. C., for intervenor.

Before FRIENDLY, KAUFMAN and HAYS, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

We are called upon to determine whether the circumstances present here require the employer to comply with the union's request for a list of the names and addresses of its employees in a bargaining unit of which the union is the exclusive bargaining representative.

## I.

The Prudential Insurance Company of America (hereinafter Prudential) is engaged in the business of selling and issuing insurance and annuity contracts throughout the United States. The Insurance Workers International Union, AFL–CIO (hereinafter the Union), is the collective bargaining representative of Prudential's District Agents within an extensive bargaining unit we shall shortly describe. On September 19, 1967, the Union filed its charge with the Board stating that by refusing to supply it with a list of the names and addresses of the district agents in the bargaining unit it represented, Prudential had committed unfair labor practices in violation of § 8 (a) (5) and (1) of the National Labor Relations Act. Thereupon, the Board issued a complaint and notice of hearing charging Prudential with refusing to bargain in good faith. In its answer, Prudential admitted refusing to supply the requested list, but denied that this action constituted an unfair labor practice.

Subsequently, the parties entered into a stipulation setting forth the relevant facts and waiving a hearing, a Trial Examiner's decision, the filing of exceptions, and oral argument before the Board. The Board approved the stipulation and accepted transfer of the case for findings of fact, conclusions of law and the issuance of a decision and order based thereon. After all parties filed

briefs, the Board on November 13, 1968, determined that Prudential's refusal to furnish the Union with the requested list constituted an unfair labor practice within the meaning of § 8(a) (5) and (1) of the Act, and ordered Prudential to furnish the Union with such a list upon request. Prudential petitions this court to review and set aside the order, and the Board cross-petitions for enforcement.[1] The Union has intervened on the side of the Board. For the reasons set forth below, we deny Prudential's petition for review, and grant the Board's cross-petition for enforcement.

### II.

Prudential has recognized the Union as the exclusive bargaining representative of its district agents within the bargaining unit since 1959, and the two have entered into successive collective bargaining agreements since that time. The most recent of these agreements was executed on September 25, 1967, and will remain in effect until September 29, 1969.

The bargaining unit of Prudential district agents represented by the Union, and covered by the agreement, is extraordinary in every respect. As of the end of 1967,[2] the year the Union filed its charge, the unit consisted of approximately 16,795 district agents employed by Prudential in thirty-four states plus the District of Columbia and the city of Toledo, Ohio.[3] For administrative purposes, Prudential has divided the operations of its agents within this area into 478 districts, with a district office located in each. Additionally, in 228 of these districts Prudential maintains one or more "detached" offices, which are administratively related to the district office of the district in which they are located; in all, there are 419 such detached offices.

Each of the more than 16,000 district agents within the unit is assigned to one of these 897 districts or detached offices maintained by Prudential across the United States. The maximum number of agents assigned to the largest district office is forty-seven, the maximum number assigned to the smallest detached office is four. Approximately 90% of these agents are required by Prudential to report to the office to which they are assigned on Tuesday mornings for 1½ to 2 hours and on Friday mornings for 2½ to 3 hours for meetings; the remainder report less frequently because of difficulties in traveling from their place of work to their district or detached office.[4] The agents all spend the rest of their time working individually in the field.

Although the Union has sought a security clause in each negotiation for a new collective bargaining agreement with Prudential, no such provision has ever been included in any of their agreements. In fact, only about 9,702 of the 16,795 agents in the unit, or 57.4% are Union members, a very slight increase from the 55.7% membership in 1959 when the Union was first recognized as the

---

1. The court's jurisdiction to consider these petitions is derived from § 10 of the Act.

2. All of the following statistics are as of that date unless otherwise specified.

3. The 34 states are: Alabama, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, and West Virginia.

This unit has been stipulated by the parties to be appropriate for purposes of collective bargaining.

4. Approximately 90.4% of the agents report to their offices twice a week as described above; another 7.6% report only to the Friday meetings; 0.6% attend meetings twice a month; 0.8% attend meetings once a month; and 0.6% attend only when specifically requested to do so. Each agent maintains a desk at the office to which he is assigned, which he is free to utilize at other times. In the first year of their employ, agents are additionally required to attend weekly training sessions at the office.

agents' bargaining representative. Moreover, the distribution of Union members throughout the unit is highly uneven; in fact, 221 of the district and detached offices, to which approximately 2,243 district agents are assigned, have no Union members.

In addition, the rate of turnover of district agents within the bargaining unit is about 25% per year. In 1967, for example, Prudential hired approximately 4,315 new district agents, while 4,241 other agents were terminated. The Union experiences a similar annual turnover in the composition of its membership; in 1967, it gained approximately 2,455 new members, while losing approximately 2,352 of its old membership.

In contrast to the size of Prudential and the extensiveness of this bargaining unit, the Union is relatively small. It has 178 local union organizations in the area encompassed by the bargaining unit. Substantially all of Prudential's district and detached offices in the unit are within the jurisdiction of one of these local unions, which also represent the employees of other insurance companies as well as Prudential agents. The Union employs only ten full time organizers, all of whom have, since 1965, been engaged in activities unrelated to Prudential.

### III.

At various times since its recognition in 1959, the Union has orally requested that Prudential supply it with a list of the names and addresses of the district agents in the bargaining unit. In 1960, it submitted a similar request in writing, explaining: "Such a list is necessary to enable us to accomplish effectively our responsibilities as the bargaining agent, and to bargain effectively for our next contract. There is no practicable way to communicate with these employees other than by mail, because of the geographical expanse of the collective bargaining unit." Prudential has consistently refused to comply. Although at various times the Union attempted to obtain the names and addresses of the nonmember agents in the unit through its members, these efforts have been unsuccessful.

Accordingly, on August 23, 1967, the Union's vice president wrote Prudential again requesting that it furnish the list, and urging that such information was "necessary and relevant to the Union's performance and fulfillment of its statutory functions and duties as collective bargaining representative of all these employees." The letter went on to explain that because of the nature of the unit,

* * * without such a list, the Union cannot advise all Agents covered by the Agreement as to the benefits offered by the Agreement, cannot gain from them the information and participation necessary and relevant to police and enforce the Agreement throughout the unit or the adherence and support necessary for their representation, or, in general, cannot in any effective manner communicate with the District Agents who are the beneficiaries of its statutory obligations as collective bargaining representative.

* * * [T]his information is, additionally required and relevant at the present time, when the Union is engaged in collective bargaining with the Company for a new Agreement; and should thus be in a position to inform all the employees represented by it and governed by the Agreement as to the course of the negotiations, and to solicit their understanding and participation in the bargaining process, including their well informed consideration and action upon any proposed new Agreement. * * *

Again, Prudential refused the request, claiming that its policy was not to disclose such information as to any organization for any purpose. Apparently realizing that further requests to Prudential would be equally futile, the Union sought aid from the Board by instituting the unfair labor practice proceeding now before us for review.

## IV.

Since the Union has acknowledged in its stipulation that the names and addresses of all the district agents within the unit who are Union members are in its possession, the real bone of contention is whether Prudential is obligated upon request to supply it with similar information as to the agents within the unit who are not Union members.

██ It is now beyond question that the duty to bargain in good faith imposed upon the employer by § 8(a) (5) includes an obligation to provide the employees' statutory bargaining representative with information that is necessary and relevant to the proper performance of its duties. E. g., N. L. R. B. v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); N. L. R. B. v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); Fafnir Bearing Co. v. N. L. R. B., 362 F.2d 716 (2d Cir. 1966). And this obligation applies with as much force to information needed by the Union for the effective administration of a collective bargaining agreement already in force as to information relevant in the negotiation of a new contract. N. L. R. B. v. Acme Industrial Co., *supra;* Fafnir Bearing Co. v. N. L. R. B., *supra.* Based upon the facts stipulated by the parties, the Board found that the information requested by the Union met these standards of necessity and relevance; Prudential claims both determinations were erroneous.

### A. *Necessity*

Prudential argues with fervor that the Union has no need for the list because it has adequate alternative means of communicating with all the agents in the unit, nonmembers as well as members. In support of this argument, Prudential suggests four such alternatives open to the Union: bulletin boards, grievance committees, hand-distribution communication, and union meetings. We shall consider them in that order.

1. *Bulletin Boards.* Under the bargaining agreement currently in effect, and under each of the past agreements, the Union is permitted to maintain a bulletin board for the posting of appropriate materials in each of the 897 district and detached offices in the bargaining unit. The Union actually maintains bulletin boards in 592 of these offices; and in the 21 such offices where none of the district agents is a Union member, Prudential has made arrangements enabling the Union to post its notices. Prudential argues that since virtually all of the district agents are required to report to their district offices at least once or twice a week for meetings, these bulletin boards provide the Union with a reasonably adequate means of communicating with the agents on matters relevant to the performance of its duty as their bargaining representative.

We must agree with the Board that such bulletin boards are in this case inadequate. In addition to restricting to some degree the substantive nature of the material the Union may post and reserving to Prudential the right to remove any unauthorized notices, the collective bargaining agreement expressly prohibits the use of these bulletin boards "to distribute material of any kind." [5]

5. The agreement provides:
Article XVIII—Bulletin Boards
1. During the period of this Agreement the Employer will permit the Union, * * * to maintain a bulletin board of moderate size, * * * in each of the Employer's district and detached offices within the unit * * *, provided * * * that the notices and announcements to be posted thereon shall be restricted to:
a. Notices of union recreational and social affairs.

b. Notices of union elections and the results thereof.
c. Notices of union appointments.
d. Notices of union meetings, with brief reference to the purpose thereof.
e. Notices, documents, or other material authorized by the International Union, * * * provided that such notices, documents and other material are governed in nature and of interest to the Agents in the said area, and provided further that a copy of each such authorized posting is sent to the Employer at

As a result, the boards are not adequate to communicate to the agents any information too lengthy or complex to be read quickly but which must more appropriately be studied for a period of time, or to poll the agents or solicit their opinions about bargaining objectives, contract administration, or other related matters. Furthermore, the nature of the agents' work substantially reduces the utility of office bulletin boards as a means of communication. Since almost all the agents are required to be in their offices for only a few hours a week (and the remainder report even less often), and their time there is taken up with company meetings, it is highly probable that many employees will not see a posted Union notice at all. Moreover, because the agents spend the rest of their time working alone, there is little likelihood they will learn of Union news from their co-workers, as might be expected in the case of employees working together in close proximity.

2. *Grievance Committees.* The collective bargaining agreement permits the Union to establish one grievance committee, composed of not more than three district agents, in each district. Such committees, Prudential claims are "the normal channel of communication between a union and employees" with regard to matters of contract administration. Without expressing any opinion on the adequacy of grievance committees in an ordinary employer-union relationship, we must agree with the Board that in this extraordinary bargaining unit these grievance committees are insufficient for the purpose suggested by Prudential.

The Union has established no grievance committee in the 221 district and detached offices where none of the agents is a Union member because, it explains, it has been unable to do so. Moreover, the contract permitting the Union to establish such committees does not authorize them to have any contact with the agents in the district except for the purpose of processing individual grievances.

3. *Hand-Distribution Communication* Prudential suggests that since a relatively small number of agents are attached to each of its district and detached offices within the unit, hand distribution of messages could be accomplished in a short time, and therefore provides a "by no means impractical" method of communication for the Union. We believe, on the contrary, that the Board was entirely justified in finding hand distribution to be a highly impracticable route for this relatively small union to travel in attempting to communicate with the well over 16,000 agents it represents.

To follow Prudential's suggested technique, the Union would be required to post at least one representative at each of 897 Prudential offices in order to effect such a distribution. Also, we cannot ignore the fact that the collective bargaining agreement expressly prohibits the Union from distributing any material or conducting any other Union activities within Prudential offices.[6] And well over half of these offices are located in buildings having other tenants and no separate entrance for Prudential employees.[7] In addition, in almost half of

the same time it is transmitted from the International Union office.

2. The bulletin board shall not be used by the Union or its members to distribute material of any kind.

3. The Union agrees that the grievance committee will, upon the request of the Employer, remove promptly from the bulletin board any notices, announcements or other material which violates any of the provisions of this Article. If the grievance committee fails to remove the material before the next reporting day the Employer may do so.

6. The agreement provides:
Article XIX—Union and Employer Activities
1. The Union agrees that neither the Union nor its members will, in the Employer's offices, solicit for union membership, or collect dues, distribute union matrial, circulars, or literature of any kind, or conduct other union business or activities in said offices.

7. Of Prudential's 897 offices within the unit, 362 are located in buildings in which it is the sole tenant, and only 96 others are in buildings having a separate outside entrance for its employees.

its offices, Prudential has no separate parking lot. Given these physical obstacles, we believe it would be well nigh impossible for the Union to reach all the agents within the unit by means of hand distribution of its communications.

4. *Union Meetings.* Prudential insists that since the Union holds regular meetings for its members,[8] it could then communicate with nonmember agents within the unit. We believe, however, that there was substantial evidence from which the Board could conclude that this suggestion was anything but pragmatic. In 1967, 7,093 of the 16,795 agents within the unit were not Union members, and many of them were assigned to offices having no union members. Unless the Union would be able to persuade these nonmembers to travel large distances to attend its regularly scheduled meetings, which seems highly unlikely, it would have to conduct many special meetings to reach them—an infeasible undertaking for this Union.

■ Prudential lastly urges that even if each of these methods of communication, considered separately, contains some inherent limitations or defects, in the aggregate, they do provide a reasonably effective means of communicating with all the agents within the unit who are "even mildly interested in being reached." This argument, similarly is without merit. Since each of the suggested methods is totally deficient in achieving the objective of reaching the nonmember agents, their aggregation cannot cure the defect. In addition to the problems caused by the vast geographic dispersion of the unit and the nature of these agents' work habits, which afford little opportunity for communication among them, the Union also must cope with the extraordinarily high rate of turnover of membership in the unit. Since Prudential does not customarily advise its new agents about the Union unless they specifically inquire, many new agents may not even be aware that there is a union representing them, or that it has negotiated a collective bargaining agreement in their behalf, or that it is prepared to ensure that their rights under it are secured.

It appears to us that the Union's need for the names and addresses of the members of the unit it represents is far greater here than it was in Standard Oil Company of California, W. O. Inc. v. N. L. R. B., 399 F.2d 639 (1968), where the Ninth Circuit found a sufficient showing of necessity to require the employer to supply such information. In *Standard Oil,* the facts relevant to need bore similarity to those in the instant case except that the number of employees in the unit was much smaller (approximately 1,500 instead of 16,795), the geographic area encompassed by the unit was also comparatively insignificant (five or six counties in California rather than more than 34 states), the employees worked together in shops, and the turnover rate of employees was not extraordinary. Prudential cautions us that if we sustain the Board's finding of need for the list on the record before us, we will in effect be sanctioning a *per se* rule that a union is always entitled to such information. We believe quite the contrary is true. In view of the unusual nature of this bargaining unit, a reversal of the Board's finding would be tantamount to a declaration that the information sought here cannot under any circumstances be necessary to a union, a result not even Prudential urges us to adopt.

B. *Relevance*

Prudential claims also that the Board erred as a matter of law in holding that the list of names and addresses of agents in the unit was relevant to the Union's fulfillment of its duties as their bargaining representative. It asserts that in truth the Union seeks this information in order that it may solicit new members within the unit.

8. The Union's local organizations hold membership meetings monthly, every three months, or less frequently when so authorized by the International's Executive Board.

■ We find no error in the Board's determination that the requested information was relevant. As the exclusive bargaining representative of all the agents within the unit, the Union has a statutory duty to represent fairly the interests of the more than 7,000 non-union agents as well as the Union members. Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Steele v. Louisville & Nashville R. R. Co., 323 U.S. 192, 165 S.Ct. 226, 89 L.Ed. 173 (1944). Standard Oil Company of California, W. O., Inc. v. N. L. R. B., supra. This obligation, being coextensive with the sphere of activities of the exclusive bargaining representative, extends to the negotiation of new contracts and also to the administration of collective agreements already adopted. It seems manifest beyond dispute that the Union cannot discharge its obligation unless it is able to communicate with those in whose behalf its acts. Thus, a union must be able to inform the employees of its negotiations with the employer and obtain their views as to bargaining priorities in order that its position may reflect their wishes. Indeed, the information sought was particularly relevant to the Union at the time of its last request, since it was then engaged in negotiating a new agreement with Prudential. Further, in order to administer an existing agreement effectively, a union must be able to apprise the employees of the benefits to which they are entitled under the contract and of its readiness to enforce compliance with the agreement for their protection.

■■ We reject as legally untenable Prudential's contention that the Union is not entitled to a list of the names and addresses of the employees in the unit it represents unless it can establish that the information is relevant to a specific bargaining function. When a union requests information which is not ordinarily relevant to its performance as bargaining representative, but which is alleged to have become so because of peculiar circumstances, the courts have quite properly required a special showing of pertinence before obliging the employer to disclose. E. g., N. L. R. B. v. Acme Industrial Co., supra (information concerning the employer's movement of certain machinery out of its plant); N. L. R. B. v. Truitt Mfg. Co., supra (information concerning employer's profits); Fafnir Bearing Co. v. N. L. R. B., supra (independent union time study of company operations). Certain other types of information, such as wage data pertaining to the employees in the unit, is considered so central to the "core of the employer-employee relationship" that it has been held to be presumptively relevant. Although the ultimate standard of relevancy is the same in all cases, with regard to information of the wage data type, the employer bears the burden of showing a lack of relevance. Curtiss-Wright Corp., etc., v. N. L. R. B., 347 F. 2d 61, 68–69 (3d Cir. 1965); International Tel. and Tel. Corp. v. N. L. R. B., 382 F.2d 366 (3d Cir. 1967), cert. denied, 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed. 2d 829 (1968); Boston Herald-Traveler Corp. v. N. L. R. B., 223 F.2d 58 (1st Cir. 1955).

■ The kind of information requested by the Union in this case has an even more fundamental relevance than that considered presumptively relevant. The latter is needed by the union in order to bargain intelligently on specific issues of concern to the employees. But data without which a union cannot even communicate with employees whom it represents is, by its very nature, fundamental to the entire expanse of a union's relationship with the employees. In this instance it is urgent so that the exclusive bargaining representative of the employees may perform its broad range of statutory duties in a truly representative fashion and in harmony with the employees' desires and interests. Because this information is therefore so basically related to the proper performance of the union's statutory duties, we believe any special showing of specific relevance would be superfluous.

Prudential's complaint that the Union may use this information to solicit new

members within the unit is simply of no moment. As the Board has so appropriately indicated, there is no clear distinction between informing nonmember agents about the benefits it has obtained and hopes in the future to secure for them and its solicitation of their support. In any case, union solicitation is itself hardly an evil—especially where, as here, the union is already the exclusive bargaining representative of the employees. it is soliciting. Moreover, the Supreme Court has upheld the propriety of a Board order requiring an employer to submit a list of the names and addresses of its employees eligible to vote in a representation election to facilitate solicitation by unions participating in the election. N. L. R. B. v. Wyman-Gordon Company, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (April 23, 1969). And, the law is well established that where a stranger union has no adequate alternative means of reaching unrepresented employees it is attempting to organize, the employer must allow the union on the premises for solicitation purposes. E. g., N. L. R. B. v. S & H Grossinger's Inc., 372 F.2d 26 (2d Cir. 1967); see N. L. R. B. v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956). It is clear to us that the Union here is on far stronger ground than in *Grossinger's*.

■ Lastly, we note that Prudential has little valid reason for opposing the Board's order. Supplying the requested list is hardly an onerous burden; it entails no such disruption of the employees' work as is ordinarily involved in allowing union organizers on the premises or permitting union experts to make an independent time study of the operations. In sum, we believe the immediate utility of this information to the Union clearly outweighs the minimal inconvenience to Prudential in having to supply it.

The petition for review is denied, and the cross application enforcement of the Board's order is granted.

FRIENDLY, Circuit Judge (dissenting):

If the real issue here were whether the Union needed help from Prudential in communicating with district agents concerning contract negotiations and administration, the Board's order might pass the substantial evidence test, although by the narrowest possible margin. While my brother Kaufman has put the case for the order as persuasively as anyone could, many doubts come to mind. The characterization of the Union as "relatively small" seems a curious description of a body having as members some 10,000 agents of Prudential [1] and thousands more of other insurance companies.[2] If the smallness relates to the Union's employment of "only ten full time organizers, all of whom have, since 1965, been engaged in activities unrelated to Prudential," that was the Union's choice, and I fail to see why it is entitled to special consideration on that account. The General Counsel's concern about the inadequacy of bulletin boards appears to be limited to offices with no Union members; he concedes that "in those offices where the Union does have members (and therefore a grievance committee), material posted on the bulletin board is sure to be read, and may be discussed during work breaks and at such outside meetings as the employees may wish to arrange." [3] Hence the Union can communicate via the bulletin boards with 68.4% of the nonmember agents and 87.6% of all agents. Again I see no warrant for accepting the Union's self-serving statement, not sup-

1. The figures in the opinion are the number of members who have consented to a check-off of union dues. The record does not disclose how many more agents are members.

2. The General Counsel's brief on appeal indicates that in 1966 the Union's total membership amounted to four times its membership at Prudential.

3. While the bulletin boards may not be be used as a method for distributing material, they can readily be used to indicate where material can be obtained.

ported by the stipulation, that it is "unable" to establish grievance committees at any of the 221 district and detached offices where none of the agents has authorized a check-off. And these offices, it may be repeated, contain only 12.4% of the agents.

None of the foregoing is meant to indicate that the Union's means of communication with the nonmember agents were ideal. The law does not require that they should be. Even in the context of an organizing campaign, it is not an unfair labor practice for an employer to force union organizers to locate the employees and communicate with them without access to the employer's property or other help from him, NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679 (1956), except when "the location of the plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them," 351 U.S. at 113, 76 S.Ct. at 685. That situation, which we found to exist with respect to the hotel employees in NLRB v. S & H Grossinger's, Inc., 372 F.2d 26, 29–30 (2 Cir. 1967), is not present here where, as in *Babcock & Wilcox*, "the usual methods of imparting information are available," 351 U.S. at 113, 76 S.Ct. at 685, in addition to the special ones made available by the collective bargaining agreement. This court has held, in denying enforcement to a remedial order that a company furnish a list of employees and their addresses to a union, that the union's entitlement to such a list is governed by considerations similar to those governing non-employee access to an employer's property. Textile Workers Union v. NLRB, 388 F.2d 896, 905–906 (1967); see Decaturville Sportswear Co. v. NLRB, 406 F.2d 886 (6 Cir. 1969). Finally I cannot at all agree that this Union has anything like as persuasive a case as in Standard Oil Company of California, W. O., Inc. v. NLRB, 399 F.2d 639 (9 Cir. 1968), where the union showed it

needed the names and addresses to counter company propaganda that there was no "necessity for union organization and representation." Here there is no intimation that Prudential has practiced any anti-union activity.

The occasion for my dissent is that we engage in self-deception when we proceed on the basis that the Union's real objective is what its request of Prudential professed. There comes a point where we "should not be ignorant as judges of what we know as men." Watts v. Indiana, 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949) (opinion of Mr. Justice Frankfurter). The Union wants the names and addresses of the agents not to poll them about contract proposals or to service their grievances but to engage in active solicitation of membership. Three facts suffice to establish this. One is the absence of any evidence that in the entire period since 1959 when the Union became the representative of the Prudential agents, it has ever consulted its members or the approximately 150 nonmembers whose names and addresses it has, with respect to contract proposals;[4] indeed the stipulation indicates that the Union communicates to its members by mail only about twice a year, except for sending them its monthly publication "The Insurance Worker." The second is the manner in which the Union conducted its campaigns in 1964–66 to obtain nonmember names and addresses through its members. Its communications with district and detached Union officials and its coverage of the campaigns in The Insurance Worker stated explicitly that the reason the Union desired the names was to facilitate recruitment of new members among the employees in the unit. The third is the out-of-hand rejection by the Board and the Union of Prudential's suggestion that if the Union's need is what it and the Board claimed, the order should be appropriately limited to the kinds of communication to which the Union's request referred.

4. Although the Union has taken strike votes and has had its contracts ratified, the Union Constitution allows only members to vote on these subjects and the actions have been taken at Union meetings.

Of course, the Union's desire to increase its rather low proportion of members is an entirely worthy one. But I do not understand Prudential to be required to assist the Union in achieving that goal by making an exception to its stipulated "policy and practice * * * to refuse to disclose or supply a list of names and addresses of District Agents to any organization seeking such a list for any purpose." Cf. The Little Rock Downtowner, Inc., 145 N.L.R.B. 1286, 1308–09 (1964), enforced as modified, 341 F.2d 1020 (8 Cir. 1965). The Board order recently sustained in NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), was based on the Board's power, under § 9 of the National Labor Relations Act, to conduct representation elections; nothing in that case or in the Board's *Excelsior* "rule" indicates that it is an unfair labor practice for an employer to decline to help a certified union increase its membership by handing over the names and addresses of employees.

At minimum I would therefore remand this case for explanation why an order limited as Prudential suggests would not meet any legitimate union needs. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 193–197, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), amply justifies this. I would also direct the Board to explain why, in order to effectuate the purposes and policies of the Act, it is necessary that Prudential be required to turn over the names and addresses of nonmember agents rather than simply mail Union communications to them at the Union's request and expense. Congress has deemed such a procedure satisfactory for union elections, Labor-Management Reporting and Disclosure Act of 1959, § 401(c), and this has long constituted the limit of the federally imposed duty of a corporation involved in a proxy contest. SEC Rule 14a–7.

There is still another subject I would ask the Board to consider on remand. While we are told that this case represents a unique situation, other unions are not likely to find it so. The Board is thus involving itself and reviewing courts in a mass of new litigation which will add to the delays that have unfortunately marred its administration of a statute under which speed is particularly important. See, e. g., Bryant Chucking Grinder Co. v. NLRB, 389 F.2d 565, 572 (2 Cir. 1967) (dissenting opinion of Judge Anderson), cert. denied, 392 U.S. 908, 88 S.Ct. 2055, 20 L.Ed.2d 1366 (1968); NLRB v. World Carpets of New York, Inc., 403 F.2d 408 (2 Cir. 1968). Now that the Supreme Court has taken note of the mounting criticisms of the Board for failure to utilize the rule-making procedures of the APA, see NLRB v. Wyman-Gordon Co., 394 U.S. at 765, 89 S.Ct. at 1429 fn. 3 (plurality opinion of Mr. Justice Fortas),[5] will not the Board, at long last, recognize the desirability of proceeding in that manner in a new field that cries for such treatment, rather than continue in the painful and time-consuming task of individual adjudication?

---

5. In addition to the criticisms there cited, see NLRB v. A. P. W. Prods. Co., 316 F.2d 899, 904–906 (2 Cir. 1963); Operating Engineers Local 49 v. NLRB, 353 F.2d 852, 856 (D.C.Cir.1965); NLRB v. Majestic Weaving Co., 355 F.2d 854, 859–861 (2 Cir. 1966); NLRB v. Penn Cork & Closures, Inc., 376 F.2d 52, 57 (2 Cir. 1967); McLeod on Behalf of N. L. R. B. v. General Elec. Co., 257 F.Supp. 690, 708 n. 14 (S.D.N.Y.1966); Peck, A Critique of the National Labor Relations Board's Performance in Policy Formulation: Adjudication and Rule-Making, 117 U.Pa.L.Rev. 254 (1968).