NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

TWIN CITY LINES, INC., Respondent.

No. 19661.

United States Court of Appeals, Eighth Circuit.

April 23, 1970.

Rehearing Denied April 23, 1970.

[redacted] 

[redacted]

William J. Avrutis, Atty., National Labor Relations Board, Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Frank H. Itkin, Atty., N.L.R.B., on the brief.

Alfred L. Hoedeman, of Hadlich & Hoedeman, Minneapolis, Minn., for respondent; Elwin E. Hadlick, Minneapolis, Minn., on the brief.

Before VAN OOSTERHOUT, Chief Judge, and MATTHES and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order issued on March 21, 1968, against Twin City Lines, Inc. The Company seeks to have the order set aside. The Board's decision is reported at 170 N.L.R.B. No. 98.

The Company provides mass public transportation in the Minneapolis and St. Paul, Minnesota, metropolitan area. Its approximately 1100 employees—including some 800 bus drivers—are represented by Amalgamated Transit Union, Local Division 1005, AFL–CIO.

On March 23, 1966, due to an unusually severe snowstorm, the Company cancelled its bus service from 5:30 A.M. until midnight. Subsequently, a dispute arose between the Union and the Company concerning the wages due Company employees affected by the cancellation of service. Pursuant to the collective bargaining agreement, the matter was submitted to arbitration. An award was filed in November, 1966. The award provided that employees should be paid on a variable schedule depending on what action they took in relation to their scheduled work.[1] The award fur-

1. The arbitration decision provided pay to be awarded according to the following schedule:

"1. All employees who reported for work on March 23, 1966, are entitled to either four (4) hours' compensation or to compensation for time actually spent on Company premises that day before they were sent home, whichever number is greater.

"2. Employees who reported for work more than one (1) hour late on March

ther provided that where the Union and the Company could not agree on the amount due a particular employee, the regular grievance procedure of the bargaining agreement should be employed.

In early December, 1966, the Company proceeded to comply with the arbitrators' decision by posting notices and providing claim forms for the employees to complete. The Company provided its foreman with some written scheduling material to help the employees refresh their memories as to their assignments for March 23, 1966. In January, 1967, the Company began making payments on the wage claims. Vouchers were provided to payees explaining the amount of time and the wage rate being paid. No explanation was given for partial or total rejection of a claim. Almost immediately, the Union began receiving complaints from its members that they were not being paid correctly. The Union then contacted the Company in mid-January and presented a written grievance requesting "to see all claims for pay filed for [March 23] by the employees of the Company who were covered by the award and the amount paid on each claim." For the next two months, the Union and the Company unsuccessfully negotiated over the request for information.[2] The Company stated that it would make all relevant data available for specifically named employees,[3] but that it would not make generally available the files and information pertaining to all 600 employees who had filed claims. The Union contended that as the bargaining agent for all employees, it had a duty to see the original arbitration award followed through and, therefore, needed the information relating to all claims filed pursuant to the arbitration award.

Finally, on March 30, 1967, the Union filed an unfair labor practice charge with the National Labor Relations Board alleging that the Company's failure to provide the requested information constituted a failure to bargain in violation of Sections 8(a) (5) and (1) of the Act. After a hearing, the Trial Examiner found that the Company's actions were violative of Sections 8(a) (5) and (1) and recommended that the Company be required to make the following information available to the Union:

"(1) Work schedules for March 23, 1966, showing the names of all unit employees scheduled to work that day and the hours thereof.

"(2) All claims received by [the Company] from unit employees under the arbitration award.

"(3) All records showing the amounts paid on each such claim.

"(4) All records reflecting the factors which caused [the Company] to reject in part or *in toto* the claims of its employees under the arbitration award.

"(5) All other records and documents in [the Company's] possession relating to factors entering into the computation of payments made by [the Company] to unit employee-claimants under the terms of the arbitration award."

23, 1966, are to have the time in excess of one hour of tardiness deducted for purposes of determining compensation in the preceding paragraph.

"3. Employees who telephoned within one hour of their regular starting time on March 23, 1966, to indicate their availability for work and who were told that work would not be available for them, are entitled to two (2) hours' compensation.

"4. Employees who neither reported for work nor telephoned to indicate their availability for work on March 23, 1966, are not entitled to compensation that day."

2. The initial meeting between the Union and the Company ended with a tentative agreement that the Union would have access to all Company files on the snowstorm claimants. However, the Company subsequently changed its position and refused to give blanket access.

3. At one point during the negotiations, the Union did request to see the claims filed by eight named employees. The Company provided the Union with access to these claims.

The Board adopted the findings, conclusions and recommendations of the Trial Examiner and now seeks enforcement of its order. In seeking to have the Board's order set aside, the Company raises two principal arguments:

(1) In the circumstances of this case, the Company was under no duty to furnish the Union the requested information.

(2) The Board's remedial order is overly broad and indefinite and clearly exceeds the needs and purposes of the Act.

■ An employer has a general obligation "to provide information that is needed by the bargaining representative for the proper performance of his duties." N.L.R.B. v. Acme Industrial Co., 385 U.S. 432, 435–436, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). While the duty is not absolute,[4] we feel the Union's request here was reasonable.

■ After the arbitration award was granted, the Company established procedures for determining entitlement under the award. No objection to the procedures was made by the Union. Each employee was given an opportunity to file a claim for pay as established by the arbitration award. The Company then checked the individual claims against their records and paid an amount it felt was due the employee. A number of employees complained to the Union about the amounts paid by the Company.[5] The Union then attempted to protect the rights of those employees who had filed claims pursuant to the arbitration award.

In attempting to protect these rights, the Union did not have equal access to the information. The Company had exclusive possession of mark-up sheets, indicating personnel assignments and hours worked for March 23, 1966; records of telephone calls made on March 23; and other records indicating why claims had not been paid, either partially or fully. Without this information, the Union would be forced "to take a grievance all the way through to arbitration without * * * the opportunity to evaluate the merits of the claim. * * * Nothing in federal labor law requires such a result." N.L.R.B. v. Acme Industrial Co., supra, 385 U.S. at 438–439, 87 S.Ct. at 569.

Additionally, while information revealing the names of employees submitting claims and the amount paid on those claims may have been theoretically obtainable by the Union, the record supports the conclusion that the Company should have supplied this information. The Union had 1100 members, over 600 claims had been filed, and the Union had three officials, only one of whom worked in their offices. The Company had already obtained the information in processing the claims and had it readily available. In such circumstances, the interests and the convenience of both parties must be weighed. In our view, the Union's need for the information outweighs the interests of the Company in protecting it. Prudential Insurance Company of America v. N.L.R.B., 412 F.2d 77 (2nd Cir. 1969),[6] cert. denied, 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969).

Furthermore, the request for information was made in good faith. The evidence indicates that the Union requested

---

4. See, e. g., N.L.R.B. v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967) ; Kroger Co. v. N.L.R.B., 399 F.2d 455 (6th Cir. 1968) ; Fafnir Bearing Company v. N.L.R.B., 362 F.2d 716 (2nd Cir. 1966) ; National Labor Relations Board v. Otis Elevator Co., 208 F.2d 176 (2nd Cir. 1953).

5. Compare, Kroger Co. v. N.L.R.B., supra.

6. "Lastly, we note that [the Company] has little valid reason for opposing the Board's order. Supplying the requested list is hardly an onerous burden * * *. In sum, we believe the immediate utility of this information to the Union clearly outweighs the minimal inconvenience to [the Company] in having to supply it." Prudential Insurance Company of America v. N.L.R.B., 412 F.2d 77, 85 (2nd Cir. 1969), cert. denied, 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969). See also, Fafnir Bearing Company v. N.L.R.B., supra.

the information as soon as it received notice that some of its members were dissatisfied with their claim payments, that it requested the information in order to determine how to proceed under the grievance procedures and that the information requested was relevant to such a determination. See, J. I. Case Company v. National Labor Relations Board, 253 F.2d 149 (7th Cir. 1958).

■■ Finally, the Company objects to paragraphs (4) and (5) of the Board's order:

"(4) All records reflecting the factors which caused Respondent to reject in part or *in toto* the claims of its employees under said arbitration award.

"(5) All other records and documents in Respondent's possession relating to factors entering into the computation of payments made by Respondent to unit employee-claimants under the terms of the said arbitration award."

The Company argues that these paragraphs are susceptible to the interpretation that the mental processes, judgments and interpretations of the Company of which a record has been made are subject to disclosure. It is not specific with respect to the type of information that it feels should be withheld from the Union. It cites no cases in support of its position. To avoid any misunderstanding of the scope of the order, however, and to obviate the necessity of a lengthy, theoretical discussion on the subject, we note that the law is well established that an employer is required to make available to a union representing its employees all data relevant and reasonably necessary to the bargaining process. See, Curtiss-Wright Corp., Wright Aero. Div. v. N.L.R.B., 347 F.2d 61 (3rd Cir. 1965); J. I. Case Company v. National Labor Relations Board, *supra*. In this case, the relevant and necessary information is: (1) the claims filed by each employee, (2) Company records showing the amount paid to each employee filing a claim, (3) Company records which formed the basis of the payment to each employee submitting a claim, and (4) Company records supporting the Company's refusal to pay those employees whose claims were denied.

■ At oral argument, the Company also argued that the Board's order was too broad as it required disclosure of the March 23 work schedule for all employees, including those who had heretofore failed to file claims. The Board took the position that the Union was not estopped from filing claims on behalf of employees who had failed to do so. While the estoppel question is not before us for a decision, we do think that the Company's point is well taken. The Union at no time complained of the procedures the Company established for payment of claims or for notification to employees that they were entitled to file claims. The main thrust of the Union's initial request and subsequent negotiations was that it needed information in order to determine responsibility whether the Company had properly paid submitted claims. Information for this purpose can be provided without including work schedules for employees who had not submitted arbitration award claims. Subdivision one of the Board's Order should, therefore, be modified to include only the names and hours worked of those employees who had submitted claims as of February 17, 1967.

The Company also contends that it was not afforded a fair hearing and that the complaint issued in the proceedings below did not meet due process standards. After careful review of the record, we are of the opinion that both arguments are without merit.

The order of the Board as modified herein shall be enforced.