434 F.2d 1198
 UNITED AIRCRAFT CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, District 91, International Association of Machinists and Aerospace Workers, AFL-CIO, Intervenor.
 No. 167.
 No. 168.
 Docket 34798.
 Docket 34928.
 United States Court of Appeals, Second Circuit.
 Argued October 14, 1970.
 Decided November 16, 1970.
 
 Joseph C. Wells, Washington, D. C., for petitioner.
 Elliott Moore, Attorney (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Stanley J. Brown, Atty., Washington, D. C., on the brief), for respondent.
 Mozart G. Ratner, Washington, D. C. (Plato E. Papps, Washington, D. C., on the brief), for intervenor.
 Before CLARK, Associate Justice,* LUMBARD, Chief Judge, and KAUFMAN, Circuit Judge.
 LUMBARD, Chief Judge:
 
 
 1
 We are called upon in this case to decide whether United Aircraft Corporation violated section 8(a) (5) and (1) of the National Labor Relations Act by refusing to furnish the unions involved with a list of the names and addresses of all employees represented by the unions in six of the Company's plants in Connecticut.
 
 
 2
 United Aircraft Corporation is engaged in the manufacture of aircraft engines and parts, helicopters, and electronic devices. Its Pratt and Whitney Division operates plants in East Hartford, Manchester, Southington, and Middletown; and its Hamilton Standard Division operates two plants in Windsor Locks. Lodges 1746, 1746A, 700 and 743 are all local Lodges of the International Association of Machinists and Aerospace Workers, AFL-CIO, affiliated with District 91, I.A.M., the charging party in the instant case, which coordinates their labor relations programs. All of these Lodges have for some years been recognized as exclusive bargaining agents in contracts covering the production and maintenance employees at the various plants of the Company. Lodge 1746 represents units of these employees at the East Hartford and Manchester plants, Lodge 700 represents these employees at the Middletown plant, Lodge 1746A represents these employees at the Southington plant, and Lodge 743 represents these employees at Windsor Locks.
 
 
 3
 On July 3, 1969, the unions filed a charge with the National Labor Relations Board alleging that the Company had violated section 8(a) (5) and (1) of the Act by its refusal to furnish the unions with the home addresses of the approximately 25,000 employees represented by the unions in the six plants. The Company agreed that it had refused to furnish the unions with the employees' home addresses, but contended that under the circumstances, its refusal did not violate the Act. More specifically, the Company contended that such information was neither necessary nor relevant to the unions' proper performance of their statutory duties and, further, that in the case of Lodges 1746, 743, and 700, the unions were not — when the requests were made — legally entitled to recognition as the exclusive representatives of the employees involved.
 
 
 4
 The Board's trial examiner found to the contrary — holding, in substance, that the home addresses of the unit employees were necessary and relevant to the unions' function as bargaining agents, and that — in the case of Local Unions 1746, 743, and 700 — the unions were legally entitled to recognition as the exclusive bargaining representative of the employees in the units where they claimed such status. By decision and order dated April 2, 1970, the Board adopted the findings and conclusions of the trial examiner. Accordingly, the Board ordered the Company to cease and desist from refusing to furnish the union with the home addresses of all the employees in their respective collective bargaining units, and promptly to furnish the union with those addresses.
 
 
 5
 United Aircraft now petitions this court to review and set aside the Board's order, and the Board cross-petitions for enforcement. The unions have intervened on the side of the Board. For the reasons set forth below, we deny United Aircraft's petition for review and grant the Board's cross-petition for enforcement.
 
 I.
 
 6
 In the summer of 1960, after a stalemate in negotiations between the Company and Lodges 1746 and 743 for new contracts, most of the employees represented by those Lodges went on strike. That strike was accompanied by violence, threats, and physical damage to the non-strikers, particularly at their homes. In August 1960, the Company and the unions finally agreed on the terms of new contracts, and a strike settlement was reached.
 
 
 7
 In the fall of 1965, the Company and the unions entered into negotiations to settle pending litigation and to enter into new three-year contracts to replace those about to expire. In March 1966, the Company questioned the unions' majority status and refused to negotiate further unless the unions could demonstrate their majority status by a Board election. The unions responded with a charge of a section 8(a) (5) violation, and the Board's General Counsel filed both a complaint before the Board and a petition for an injunction in the United States District Court in Connecticut.
 
 
 8
 On August 5, 1966, the district court granted an injunction requiring the Company to recognize and bargain with the unions. As a consequence of the court's order, the Company entered into new two-year contracts with the unions. Those contracts contained a "savings clause" to the effect that if the Company was ultimately found not to be obligated to bargain with the unions, it could terminate. The district court then dissolved its order. In October 1966, Trial Examiner Ricci held a hearing on the General Counsel's complaint and found that by withdrawing recognition from unions in March 1966 and refusing to bargain, the Company had violated section 8(a) (1) and (5); he ordered the Company to bargain with the unions.
 
 
 9
 On November 27, 1967, the Board issued a decision upholding the trial examiner's findings. That decision was promptly appealed by all parties to the United States Court of Appeals for the District of Columbia Circuit.
 
 
 10
 On September 29, 1968, the unions requested the Company to give them a list of the names and addresses of all bargaining unit employees, and on September 30, the Company denied the unions' request. Nevertheless, on October 15, 1968, the Company sent a letter to the unions proposing that when a local union desired to write letters to all employees on matters relating to contract negotiations, the local deliver the sealed envelopes to the Company and the Company would, by addressograph equipment, put the names and addresses on the envelopes and mail them. The Company stated, however, that this offer was subject to the availability of the addressograph equipment and the Company had first call on the equipment. Nevertheless, the next month, the unions took advantage of the Company's offer and sent letters to all employees by this means.
 
 
 11
 In November 1968, the Company and the unions entered into negotiations for the Pratt and Whitney Division for new contracts to succeed the ones entered into in 1966. The Company again questioned the unions' majority status; and the unions agreed to submit sufficient dues checkoff cards to constitute a majority and, if that was not enough, to have a Board-conducted election. The Company rejected this offer, proposing that they continue to negotiate and that any agreement reached contain the "savings clause" giving it the option to terminate the contract in the event the Court of Appeals for the District of Columbia should reverse the Board's decision and find that the Company had no obligation to bargain with the unions in March 1966. The unions, however, opposed inclusion of the "savings clause" and asked the Company "unconditionally and unequivocally" to recognize the unions as the exclusive bargaining representatives of the employees involved. Finally, the Company signed three-year contracts containing clauses of unconditional exclusive recognition of the unions and omitting the "savings clause." Both parties agreed, however, that by their actions they were not waiving any legal position previously taken.
 
 
 12
 In March 1969, the Company and the unions began negotiations for new contracts for the Hamilton Standard Division, but this time the Company did not question the union's majority.
 
 
 13
 On May 29, 1969, while those negotiations were proceeding, the Court of Appeals for the District of Columbia Circuit denied enforcement of the Board's order of November 27, 1967, and found that in March 1966 the Company had a reasonably grounded good-faith doubt as to the union's majority and hence had not violated the Act. Lodges 1746 and 743, Int. Ass'n of Mach. and Aero. Workers v. N.L.R.B., 135 U.S.App.D.C. 53, 416 F.2d 809 (1969). But on July 1, 1969, despite this decision, the Company signed new contracts for its Hamilton Standard Division, containing exclusive recognition clauses and omitting the "savings clause." All contracts covering both the Hamilton Standard and Pratt and Whitney Divisions contained provisions for dues checkoff authorizations, but no other form of union security.
 
 II.
 
 14
 The Company employs large numbers of people whose homes are dispersed over a wide geographical area. Of the 17,000 employees at the East Hartford and Manchester plants, only a little over 6,000 live in towns closer than seven miles from the plant. The rest live in some 118 different towns in Connecticut, in 27 towns in Massachusetts, and in various places in other states. Similarly, only 641 of the 3,000 employees in the Southington plant and 693 of the 1,700 employees in the Middletown plant live in those towns. The rest are scattered over a radius of more than 40 miles from the plants. The same wide dispersion can be found among the 5,000 employees at the Windsor Locks plants.
 
 
 15
 When the Company has had serious labor relations problems in the past, it has resorted to the mails to reach the employees with its point of view. Thus, the Company has sent several letters to its employees pertaining to collective-bargaining contracts proposals. After negotiations with Lodges 1746 and 743 broke down in 1966, it mailed a series of letters to the employees at the affected plants, explaining and seeking to justify its action. Finally, in November 1968, after refusing the union's request for the home addresses of its employees, the Company utilized the mails to explain its position on the refusal to the employees.
 
 
 16
 The unions, too, use the mails to communicate with employees, but they can only reach those of their members for whom they have up-to-date addresses. Moreover, they have no record whatever of the addresses of the roughly 10,000 other unit employees who are not union members. The unions have found that, under these circumstances, the most feasible means of communication with all employees, members as well as nonmembers, is through handbills which are distributed to the employees as they enter the plants at the beginning of the shifts. During 1968, the unions distributed handbills on about 45 or 50 occasions.
 
 
 17
 In 1964 the president of Lodge 1746 requested the Company to permit its handbill distributors (who are usually Company employees) inside the plant to avoid bad weather. The Company refused, but offered to permit the Union to use its racks for the handbills, providing no conflicting use of the racks was planned. This offer was explored and Lodge 743 did use the racks at one of the Windsor Locks plants for some time. But the other Lodges, after ascertaining that the racks would only be open at the end of the shifts and that advance notice was required to avoid conflicts over the use of the racks, declined the Company's offer.
 
 
 18
 The collective-bargaining contracts obligate the Company to make space available on its bulletin boards for the posting of union notices, but they limited the subject matter of the notices which can be posted, and prior approval by a Company official is required.
 
 
 19
 The unions' access to employees at the plants through shop stewards and union stewards is severely limited by the strict enforcement of the Company's no-solicitation rule and its ban on solicitation of employees for union membership or dues conducted upon the premises of the Company during all paid time, whether or not the employee is working. Thus, the unions' stewards have the opportunity to discuss union matters with the employees only before and after work and during lunch periods; and because the employees have thirty-minute lunch breaks which are staggered every fifteen minutes, the opportunities for conversation between stewards and employees are further limited.
 
 
 20
 It was in light of all these circumstances that the unions requested the Company in September 1968 to furnish them with the names and addresses of all members of the bargaining units which they respectively represented. After the Company refused to do so, the unions filed an unfair labor practice charge with the Board's General Counsel; and on July 3, 1969, the General Counsel filed a complaint alleging that the Company's action had violated § 8(a) (5) and (1) of the Act. On November 28, 1969, Trial Examiner Vose found that the Company had so violated the Act, and on April 2, 1970, the Board upheld the trial examiner's findings and conclusions and ordered the Company to furnish the unions with the addresses.
 
 III.
 
 21
 The Company's first claim on this appeal is that it had no obligation to bargain with the unions so as to require it to give the unions the employees' addresses, because its status as exclusive bargaining representative of the employees was due to the coercion and taint of the district court's injunction and the Board's decision, both of which rested on a finding later reversed by the District of Columbia Court of Appeals. The trial examiner found that the Company's 1966 grant of recognition to the unions and the consequent contracts were indeed attributable to the compulsion of the court's injunction. Hence, since the unions' initial request for addresses and the Company's refusal to provide them came in September 1968, while the coerced 1966 contracts were still in effect and before the new negotiations began, the Company's initial refusal was not an unfair labor practice. But, as the trial examiner correctly found, the unions' request was an ongoing one and the Company's grant of recognition in the 1968 negotiation was not coerced. We hold therefore that the Company's continuing refusal to provide addresses after having been given proof in the 1968 negotiations of the unions' majority status cannot be justified by the coercion of the prior contract.
 
 
 22
 The trial examiner found that the unions in the various plants acquired majority status at least by the last day of the month during which the total number of dues checkoff cards furnished to the Company by the particular lodge reached fifty percent of the employees. These dates were, for the various plants, October 31, 1968, November 30, 1968 and December 31, 1968. This finding is supported by substantial evidence in the record, and the Company does not dispute it. Rather, the Company claims (1) that its grant of recognition to the unions during the 1968 negotiations was directly coerced by the Board's 1967 decision which was then in effect but which was later found by the District of Columbia Court of Appeals to be incorrect, and (2) that if the unions had gained a majority by the time of the 1968 negotiations, the Company still had no duty to recognize them or to bargain with them concerning the address lists, because that majority was obtained only through the unwarranted assistance given to the unions by the district court and the Board.[1] We reject both of these contentions.
 
 
 23
 The Company's argument that its 1968 grant of recognition was coerced by the Board's 1967 decision has no merit, for, as the Company itself concedes, the unions had gained a majority by late 1968 and it was the Company's knowledge of that majority, as evidenced by the dues checkoff cards in its hands, that led it to enter into the 1968 negotiations.
 
 
 24
 The Company is estopped from raising its second argument — that the unions' majority was a result of the court's and the Board's unlawful assistance. The Company failed to charge such "taint" when the unions claimed in the late 1968 and early 1969 negotiations that their dues checkoff cards established their majority status; it rejected the unions' offer to prove their majority in an election; it accepted in the 1968 and 1969 contracts the unconditional and unequivocal recognition of the unions as the exclusive bargaining agent; and it yielded to the unions' demand that the "savings clause" be omitted from the new contracts, thereby knowingly waiving its option to terminate in the event of a favorable decision in the District of Columbia case. All of these actions indicate that in the 1968 and 1969 negotiations the Company accepted the fact that the unions were the exclusive bargaining representatives and that their majority was not tainted.
 
 
 25
 Moreover, when the Company signed a new contract with Lodge 743 at the Hamilton Standard Division on July 1, 1969, it already knew of the District of Columbia Circuit's May decision, and it nevertheless accepted the omission of the "savings clause" and the inclusion of the clause granting unconditional recognition to the union as exclusive bargaining representative. If a "taint" charge was to be made at all, it surely should have been made at least at that time. To permit an employer to save his doubts for use at his convenience, as the Company here seeks to do, could subvert the bargaining process and the policies of the Act.
 
 
 26
 Furthermore, the Company's assertion, if accepted, would render unlawful and unenforceable all the 1968 and 1969 contracts between the Company and the unions; and the Company itself has not only not disavowed or sought to terminate those contracts even after the District of Columbia decision, but has insisted that they are valid and in force. Thus the Company's argument of taint seems to us to be a make-weight, which it wishes to use in this case to escape the enforcement of its obligation to furnish addresses, while, at the same time, it refuses to accept all the consequences of its claim — that is, that the contracts are unenforceable for all other purposes as well.
 
 IV.
 
 27
 The Company's second claim is that the record evidence fails to establish the "necessity" or "relevance" of providing the unions with the home addresses of employees. We reject that claim.
 
 
 28
 It is, of course, well settled that the duty to bargain in good faith imposed upon the employer by section 8(a) (5) includes an obligation to provide the employees' bargaining representative with information that is necessary and relevant to the proper performance of its duties, including the effective administration of the collective bargaining agreement in force. N.L.R.B. v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); N.L. R.B. v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); Fafnir Bearing Co. v. N.L.R.B., 362 F.2d 716 (2d Cir. 1966). We held in Prudential Insurance Company of America v. N.L. R.B., 412 F.2d 77 (2d Cir. 1969), that the names and home addresses of all bargaining unit employees constituted, in the circumstances of that case, information that was necessary and relevant to the proper performance of the unions' duties. We stated that since a union is under a statutory obligation to represent non-member employees, as well as members, the union must be able to communicate with all employees. We found that in that case the names and addresses of all bargaining unit employees were vital to such communication, and hence we required the employer to furnish the union with those names and addresses. See Standard Oil Company of California v. N.L.R.B., 399 F.2d 639 (9th Cir. 1968), where the Ninth Circuit came to the same conclusion on facts very similar to those in the instant case.[2] See also Excelsior Underwear, Inc., 156 N.L.R.B. 1236 (1966); and N.L.R.B. v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).
 
 
 29
 In this case, the trial examiner found that addresses were both necessary and relevant to the unions' performance of its duties, and there is substantial evidence in the record to support his findings.
 
 A. Necessity
 
 30
 In view of the wide dispersal of employee homes, it is clear that the unions need an effective means of communication. The severity of the problem is increased by the relatively low percentage of union membership, which limits both the effectiveness of the intraunion modes of communication and the reliability of the membership as a representative sample of employee sentiment on a particular topic. We reject the Company's contention that the existing means of communication — handbilling, the use of company distribution racks, bulletin boards, the use of shop stewards and union stewards, and the Company's offer to mail union communications to the employees' home addresses — are adequate to fulfill union functions.
 
 
 31
 1. Handbilling. The union is able to hand leaflets to employees as they come and go from work. But as we stated in N.L.R.B. v. United Aircraft Corp., 324 F.2d 128, 130 (2d Cir.), cert. denied, 376 U.S. 951, 84 S.Ct. 969, 11 L.Ed.2d 971 (1963), "Sidewalks and street corners are subject to the vicissitudes of climate and often force solicitation at awkward times, as when employees are hurrying to and from work." Where, as here, the unions are attempting to reach over 20,000 employees at six plants, the logistical problems of handbilling are overwhelming. The union needs enough handbillers at the many plant entrances with enough flyers for that particular entrance. Since the Company does not allow non-employee handbillers at the inner gate locations most suitable for this activity, the unions must use employees, who have to stop distribution in time to get to work. Hence, latecomers are missed, as are all employees who work irregular hours or are absent on that date. Finally, since handbilling is necessarily done at shift changes when great numbers of employees are entering and leaving the plants, it is inevitable that many people are missed.
 
 
 32
 2. Distribution Racks. The Company's offer to open up its distribution racks to union literature was subject to three conditions: that advance notice would be required when the racks were to be used, that they could be used only when the Company had no use for them, and that they would be locked until the end of the shift. The first two conditions clearly prevent the unions from relying on these racks in an emergency, and the latter condition, which prevents distribution until the employees are leaving the plant, renders the method impractical. The unions have found that the beginning of the shift is the best time for distribution, since employees are more likely to take a flyer; in addition, they can read the flyer at lunch break. After work, employees are more likely to be in too much of a hurry to stop for leaflets.
 
 
 33
 3. Bulletin Boards. The collective bargaining agreements severely limit the subject matter of the notices that may be posted on bulletin boards and require prior approval by a Company official. Twice in a short period before the hearing in this case, the Company refused to post a notice tendered by the unions. On the first occasion the Company took the position that a notice concerning a "golf league" was "recreational" rather than "social" and hence not permitted by the agreement. On a second occasion, the Company refused to post notices concerning shop steward elections, a subject expressly included in the contract, assertedly because the signs were too large and because they contained small maps of the plants which allegedly created security problems. Although the union offered to block out the maps, the Company still refused either to post the notices or to arbitrate the dispute. Moreover, as the trial examiner noted, even if the Company had not placed these restrictions upon the unions' use, "bulletin boards by their very nature do not provide an effective means of communicating with employees on important matters." The message must be short and simple because of space limitations and because employees hurrying by have little time available for reading; and in addition, the notice must compete for attention with other notices.
 
 
 34
 4. Shop Stewards and Union Stewards. The remaining in-plant method of communication is the use of shop stewards and the union stewards. The stewards, however, are obviously not an appropriate means for placing a substantial message before the entire employee complement more or less simultaneously. Because the Company strictly enforces a ban on solicitation of employees for union membership or dues, as well as on carrying on union business, upon the premises of the Company during all paid time, whether or not an employee is working, stewards can reach employees only before and after work and during lunch; and since lunch breaks are staggered, this opportunity is further limited.
 
 
 35
 5. The Company's Offer to Mail Communications for the Unions. Under the circumstances here, the only method which affords an effective means of reaching virtually every employee with a substantial message under conditions which allow thoughtful consideration is direct mail. As has been stated, however, the unions are presently unable to use that method effectively.[3]
 
 
 36
 Although the Company did offer to mail union communications to the employees' home addresses, that method is plainly unsatisfactory. The Company's offer allows it to preempt the mailing equipment. This would be crucial in times of emergency when the unions might well want to use the mails, for this is the very time when the Company would want to do so as well and would preempt the equipment. Moreover, the offer limits the subject matter of the letters which it will mail for the unions to "matters relating to contract negotiation," leaving the Company as sole judge of what could be mailed. For instance, while the Company did mail out a copy of the unions' contract proposal in November 1968, it refused to send out a survey concerning the employees' interest in an automobile insurance plan. The unions' duties as exclusive bargaining representative do not end at "matters relating to contract negotiations"; they also include other matters such as this insurance plan.[4]
 
 
 37
 Thus we find that none of the alternative methods suggested by the Company is adequate to achieve the unions' objective of reaching all the bargaining unit employees. Moreover, as we held in the Prudential case, since each of the five alternative methods is inadequate by itself to achieve the desired goal, their aggregation cannot cure the defect.
 
 B. Relevance
 
 38
 In Prudential, we held that "[a]s the exclusive bargaining representative of all the agents within the unit, the Union has a statutory duty to represent fairly the interests of the * * * nonunion agents as well as the Union members * * * [and] data without which a union cannot even communicate with employees whom it represents is, by its very nature, fundamental to the entire expanse of a union's relationship with the employees." 412 F.2d at 84.
 
 
 39
 The Company argues that, although the unions' avowed purpose may be relevant, the true motivation for the unions' demand is either to solicit for union membership or to go to the homes of those who did not strike in 1960 and to continue to visit violence upon them. But as we stated in the Prudential case, the "complaint that the Union may use this information to solicit new members within the unit is simply of no moment. As the Board has so appropriately indicated, there is no clear distinction between informing nonmembers about the benefits it has obtained and hopes in the future to secure for them and its solicitation of their support. In any case, union solicitation is itself hardly an evil — especially where, as here, the union is already the exclusive bargaining representative of the employees it is soliciting." Prudential Ins. Co. v. N.L.R.B., supra, 412 F.2d at 85. Moreover, there is no evidence here that the unions would use the list of addresses to go to the employees' homes for violent purposes.
 
 
 40
 Finally, in this case as in Prudential, "supplying the requested list is no onerous burden; it entails no disruption of the employees' work as is ordinarily involved in allowing union organizers on the premises or permitting union experts to make an independent time study of the operations." Prudential Ins. Co. v. N.L.R.B., supra, 412 F.2d at 85.
 
 V.
 
 41
 The Company's final claim is that the unions' demand for addresses violates the employees' right to privacy, especially in view of the unions' violence against nonstrikers in 1960. That claim, however, has little merit in the circumstances of this case. In determining whether the disclosure of addresses to a union violates the employees' right to privacy, the crucial factor appears to be the likelihood of a clear and present danger to the employees involved. The trial examiner here found little likelihood of a clear and present danger to the non-striking employees, and there is substantial evidence to support his finding. Although there was evidence of violence in the past, it took place ten years ago, and there has been no evidence of harassment since that time. Furthermore, the threatening statements were merely personal and not attributable to the unions, and no employee testified to present fear of violence.
 
 
 42
 Petition for review denied and Board's order enforced.
 
 
 
 Notes:
 
 
 *
 United States Supreme Court, retired, sitting by designation
 
 
 [1]
 The Company's argument does not apply to the Southington plant where it has never questioned the particular Lodge's majority
 
 
 [2]
 In both situations union membership included only a small majority; in both there was no union security clause in the contract; in both the Company had practiced anti-union activity and the union had the need to counteract it; in both the homes of the employees were scattered over a wide area (here even more than inStandard Oil); and in both the alternative means of communication were found to be inadequate. In Standard Oil, the court upheld the Board's conclusion that the furnishing of employee addresses was relevant and necessary to the union's performance of its responsibilities in collective bargaining and contract administration, and it required that the employer furnish the requested list of addresses.
 
 
 [3]
 See p. 469supra.
 
 
 [4]
 Other such matters specifically mentioned at the hearing included advising employees as to their rights under the pension plan; how to collect on group insurance; information on the handling of grievances; decisions of arbitrators, the Board, and the courts; and clarification of employee rights under the collective bargaining agreement, as well as workmen's compensation, social security, and medicare